753 A.2d 84

**Keith Alexander BROWN**

v.

**STATE of Maryland.**

**No. 83, Sept. Term, 1999.**

Court of Appeals of Maryland.

June 9, 2000.

182

Byron L. Warnken and Linda L. Mason (Linda L. Mason, Law Offices of Bonnie L. Warnken, on brief), Baltimore, for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

After a jury trial in the Circuit Court for Baltimore City, petitioner was convicted of first degree murder, along with various handgun offenses, for which he was sentenced to life imprisonment without the possibility of parole. The victim was petitioner's girlfriend, Makea Stewart. One of the witnesses who testified against petitioner was his wife, Jennifer Sellers Brown, and, in the course of her testimony, she stated that, on the night of the murder, petitioner confessed to her that he had killed Ms. Stewart.

Petitioner complains that that testimony was inadmissible under Maryland Code, § 9–105 of the Courts and Judicial Proceedings Article, (CJP), which provides that "[o]ne spouse is not competent to disclose any confidential communication

between the spouses occurring during their marriage." Correctly regarding his inculpatory statement to Ms. Brown as a confidential communication made during the marriage, petitioner contends that his wife was, indeed, "incompetent" to testify regarding it.[1] Despite the language of the statute, the State views § 9–105 not as rendering a spouse "incompetent," but as providing petitioner with a *privilege* to preclude testimony regarding confidential marital communications, a privilege that can be waived. In this case, it argues, the privilege was waived by petitioner's contention, expressed at different times throughout the trial, that his wife was, in fact, the killer—that she killed Ms. Stewart out of jealousy. The State urges that, when a defendant asserts a "my spouse did it" defense, he or she waives any privilege under the statute to prevent the spouse from relating otherwise confidential marital communications in response to that accusation.

In affirming petitioner's convictions, the Court of Special Appeals, in an unreported opinion, accepted the State's argument. Over a dissent, it held flatly that § 9–105 provides a privilege, not an actual incompetence, and that the privilege "is waived by the criminal defendants who, either personally or through counsel, present a 'my spouse did it' theory of defense." We granted *certiorari* to review that conclusion. We shall hold that (1) § 9–105 does not render a spouse "incompetent" to testify regarding confidential marital communications but rather establishes a privilege on the part of the person making the communication to preclude testimony by the person's spouse that discloses the communication, (2) the privilege may be waived by the person, but (3) it was not waived in this case. Accordingly, we shall reverse the judgment of the Court of Special Appeals.

## BACKGROUND

Makea Stewart was found dead around 3:30 a.m. on September 10, 1995 in an alleyway behind 3326 Gwynns Falls Park-

---

1. For ease of sentence structure, we shall occasionally use the term "incompetent" in place of the statutory term "not competent." We regard the terms as synonymous.

way, in Baltimore City. She had been shot eight times with a .380 caliber handgun that was owned by petitioner and was later recovered from his car. Petitioner's fingerprints were found on the magazine of the weapon. A witness, Jerry Manns, reported hearing gunshots from his kitchen window at approximately the time of Ms. Stewart's reported death. From his window, he saw an African–American male in his twenties leave the alley and drive off in a small two-door car with a malfunctioning muffler. He saw the same man return a short time later with a gun in his hand. Manns heard a single gunshot and then saw the man get back into his car and leave. It was later established that petitioner, an African–American male, drove a two-door Mazda with a faulty muffler. Near Ms. Stewart's body Detective Barlow discovered her pager, which showed that several calls had been made to the pager from a cellular phone later found in petitioner's possession.

Ms. Stewart's mother, Jill Sullivan, informed Detective Barlow that Ms. Stewart had been having an affair with a married man named Keith, that her daughter told her two days before the murder that she (Ms. Stewart) was pregnant with Keith's baby and that she was going to confront Keith about the pregnancy. A friend of Ms. Stewart, Cassandra Green, testified at trial that she overheard Ms. Stewart telling petitioner that she might be pregnant and that petitioner told the victim that he knew she was pregnant and that she had a decision to make. Genetic tests confirmed that, at the time of her death, Ms. Stewart was pregnant with petitioner's child.

The State's theory was that petitioner, from the very inception of his marriage to Ms. Brown, was romantically involved with Ms. Stewart, that Ms. Stewart became pregnant as a result of the affair, that petitioner insisted that she abort the pregnancy, that she refused, and that he killed her because he feared that the pregnancy would wreck his marriage. Petitioner made clear, both at the outset and throughout the trial, that his defense was based on the proposition that his wife, who was aware of his affair with the victim and had threatened both him and the victim in the past, killed the victim out

of jealousy. He asserted that position to the court in arguing a pre-trial motion, he asserted it to the jury in his opening statement, he implied it in his own testimony and in the cross-examination of some of the State's witnesses, and he again asserted it more directly in closing argument.

In its case-in-chief, the State called Ms. Brown, who recounted that she and petitioner were married on August 20, 1994, and that on September 9, 1994—the day they signed a lease on their new apartment—she discovered a picture of Ms. Stewart in petitioner's car and thus learned that he had a girlfriend. The problem was exacerbated by the fact that Ms. Stewart continued to call petitioner, which led to arguments between him and Ms. Brown. Ms. Brown had a number of conversations with Ms. Stewart, complaining about her calls to petitioner. They were all "heated discussions," she said. At one point, when petitioner said that he had a doctor's appointment and would be late, Ms. Brown discovered him and Ms. Stewart together at a bowling alley, which led to another argument and to Ms. Brown throwing a bottle at the victim. All of this testimony was admitted without objection.

Ms. Brown then testified that on September 9, 1995—the night of the murder—petitioner returned home at around 4:00 a.m., that she asked him where he had been and that he refused to tell her. Ms. Brown then got into an argument with petitioner about his talking with the victim. In response to the question, "What happened then," Ms. Brown said, apparently to everyone's surprise, "He told me he killed her and I didn't believe him."

Counsel immediately claimed surprise and complained that the State had failed to disclose this inculpatory statement. The court reserved on counsel's implicit objection but noted that it was "not persuaded that it's excludable at this point," apparently because the admission, which was not included in the written statement Ms. Brown had given to the police, was not one made to a State agent. The focus was solely on the alleged non-disclosure, the court stating that it had "heard nothing to indicate that it's something that the State was

mandated to warn you about in advance, basically." Petitioner requested "a continuing objection to the entire line of questioning," without specifying any other basis for the objection. Ms. Brown then repeated that petitioner told her that he had killed the victim. She added:

"I didn't believe him so I asked him why and where and he said that . . . he did it because I always harassed him about her and he told her that she would always be around, she wouldn't leave him alone and she wasn't going anywhere so he killed her and then I asked him, well, where, he wouldn't tell me. I said well, where's your gun? He wouldn't tell me. And then I asked him how and he wouldn't tell me. He said the less I knew the better it was for him and I told him that he was going to jail and he said I know, and that was it."

Ms. Brown recounted two additional conversations. Later that evening, they learned from television news that two bodies had been found, "and I asked if one of them was her and he said yes. I said which one, he wouldn't tell me." At some point during the next five days, Ms. Brown put petitioner out of the apartment. After petitioner was arrested, Ms. Brown said that she and petitioner talked about the murder on several occasions:

"[O]n one visit I asked him if she cried and he told me he didn't know and he told me what happened and that he was scared and when she turned to walk away he started shooting and he couldn't stop, and that was it. And then I asked him over the phone if he ever thought about her and he said only different ways that it could have been done, referring to how she died."

At the conclusion of Ms. Brown's testimony, petitioner, for the first time, called the court's attention to § 9–105, arguing that, until the statement was "blurted out," there was no occasion to raise the confidentiality issue. Although initially admonishing counsel for not having raised that objection earlier, the court was eventually convinced that "[t]his is a competency issue"—not a privilege—and that, because the

defense was previously unaware of the admission, it could be excused for not having raised the issue earlier. It therefore instructed the jury that the testimony was stricken. Following further discussion at a later point in the trial, however, the court reconsidered that ruling. Relying on *Harris v. State*, 37 Md.App. 180, 376 A.2d 1144 (1977), in which the Court of Special Appeals held that the exclusionary provision of § 9–105 did not apply when the confidential communication "constitutes a threat or crime against the other spouse," *id.* at 184, 376 A.2d at 1146, the court ultimately concluded that, by accusing Ms. Brown of having committed the murder, he put her at risk and could not invoke § 9–105 to preclude her from replying to that accusation. The court then informed the jury that it had reconsidered its ruling and that Ms. Brown's testimony as to "his confession, virtually of the murder" was "unstricken" and "back in the case." Petitioner testified in his defense. He denied confessing to his wife that he had killed Makea Stewart and denied as well ever having indicated to her that he knew anything about Ms. Stewart's death.

## DISCUSSION

### Section 9–105: Competence or Privilege?

Petitioner's argument is straightforward and is based on a strict and literal construction of the word "competent," as used in the statute. He reminds us that § 9–105 declares a spouse "not competent" to disclose certain communications. "Not competent," he posits, means what it says—not competent, legally unqualified to testify to the matter. When a person is declared "not competent," he urges, there are no exceptions to the disqualification; there is no doctrine of waiver. No action or inaction by the person, by the person's spouse, or by anyone else can overcome the legal disqualification.

The State does not disagree with petitioner's description of true incompetence but argues that that is not what the General Assembly intended when it enacted § 9–105. Looking to the legislative history of § 9–105, to the way we have characterized the statute in the past, and to the way other

courts and leading commentators on evidence law have viewed similar statutes, the State insists that, despite its use of the words "not competent," § 9–105 does not render a spouse incompetent, but merely provides a privilege to preclude testimony by a spouse that would disclose a confidential marital communication—a privilege that may be waived.

We are dealing here with a question of statutory construction—did the Legislature, when it first enacted and subsequently amended the statute that is now codified as § 9–105, really mean to render a person "not competent" to testify to confidential marital communications, understanding that, by doing so, it would admit of no circumstance, in either a civil or criminal case, under which such a communication could be revealed? Did the Legislature intend to disqualify a person from testifying to such a communication even when the person's spouse has already disclosed the communication to others? Did it intend to disqualify a person from testifying to such a communication even when the person's spouse solicits the testimony, or at least does not object to it? If the communication made by petitioner to his wife had been *exculpatory* rather than *inculpatory,* but nonetheless confidential, did the Legislature intend, as a matter of Maryland evidence law, to preclude Ms. Brown from testifying to that communication without objection from petitioner? Did the Legislature intend that a stranger to the marriage—perhaps even the State in a criminal case—be able to preclude testimony that both spouses desire be admitted on the ground it would disclose a communication that was confidential when made?

 The rules of statutory construction are well-known and well-settled. Our paramount objective is to ascertain and effectuate the intent of the Legislature when it enacted (and periodically amended) the statute. If the language is clear and unambiguous "and is consistent with the purposes of the legislation in general and the particular provision being interpreted," our inquiry ordinarily ends at that point. *McNeil v. State,* 356 Md. 396, 404, 739 A.2d 80, 84 (1999). As we pointed out in *Kaczorowski v. Mayor & City Council of Baltimore,* 309

Md. 505, 515, 525 A.2d 628, 632 (1987), however—and in many cases since—when there is some question as to whether a literal interpretation of the language used in the statute really would be consistent with the purpose of the legislation, we may look beyond that literal meaning. In such a circumstance, "the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Id.* at 513, 525 A.2d at 632 (quoting *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730, 732 (1986)). As we pointed out in *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993), "[i]t often is necessary to look at the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute." *See also C.S. v. P.G. County Social Services*, 343 Md. 14, 24, 680 A.2d 470, 475 (1996).

Section 9–105 cannot be considered in isolation; it was not considered in isolation by the Legislature. It is part of the subtitle of CJP dealing with the "Competence, Compellability, and Privilege" of witnesses. Section 9–101 sets forth the general rule that, unless otherwise provided in the subtitle, (1) a person may not be excluded from testifying in a proceeding because of incapacity from crime or interest in the matter in question, and (2) "[l]itigants and their spouses are competent and compellable to give evidence." There are two exceptions to that general rule dealing with spouses. Section 9–105, as noted, precludes a spouse from disclosing any confidential communication between the spouses during the marriage, and § 9–106 declares that, except in cases of spousal or child abuse, the spouse of a person on trial for a crime may not be compelled to testify as an adverse witness.

As we pointed out in *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977), as the Supreme Court observed a short time later in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), and as Wigmore and McCormick relate, the limitations on spousal testimony, including those embodied in §§ 9–105 and 9–106, stem from different roots—an ancient

common law privilege to preclude one's spouse from testifying adversely, a nearly-as-ancient common law disqualification to testify either adversely or on each other's behalf, and, more recently, a predominantly statutory preclusion of testimony regarding confidential communications made during the marriage.

The earliest root seems to be the privilege that a husband had to preclude adverse testimony by his wife. Wigmore cites a 1580 chancery decision, *Bent v. Allot*, 21 Eng. Rep. 50 (Ch. 1580), for the proposition that, at that early time, "the wife's testimony on her husband's behalf is treated as receivable, while his privilege to keep her from testifying against him is apparently sanctioned." 8 JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE § 2227, at 211 (McNaughton Rev.1961).[2] Wigmore posits that the privilege may have derived from principles applied by the ecclesiastical courts and from "a natural and strong repugnance [that] was felt (especially in those days of closer family unity and more rigid paternal authority) to condemning a man by admitting to the witness stand against him those who lived under his roof, shared the secrets of his domestic life, depended on him for sustenance and were almost numbered among his chattels." *Id.* at 212.

Writing in 1628, Edward Coke described a very different exclusionary rule, with a different theoretical basis. Coke treated the rule not as a husband's privilege but as an absolute disqualification—that a wife "cannot be produced either against or for her husband, *quia sunt duae animae in carne una* [for they are two souls in the same flesh]." 8 WIGMORE, *supra*, § 2227, at 212 (quoting EDWARD COKE, A COMMENTARIE UPON LITTLETON 65 (1628)). The *Trammel* Court explained:

---

**2.** The report of *Bent v. Allot* in the English Reports is brief but supports Wigmore's statement. It states: "It is informed that Colston, one of the defendants, examined his own wife as a witness: it is therefore ordered, the plaintant may take a subpoena against her on his behalf; and if Colston will not suffer her to be examined on the plaintant's party, then her examination on the said Colston's party is suppressed."

"This spousal disqualification sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife."

*Trammel, supra,* 445 U.S. at 44, 100 S.Ct. at 909, 63 L.Ed.2d at 190–91. *See also Coleman, supra,* 281 Md. at 541–42, 380 A.2d at 52.[3]

Coke's rule of disqualification was obviously much broader than the earlier-recognized privilege. It not only applied in both civil and criminal cases but precluded testimony either for or against the spouse. Blackstone, writing 140 years after Coke, commented:

"But, in trials of any sort [husband and wife] are not allowed to be evidence for, or against, each other: partly because it is impossible their testimony should be indifferent; but principally because of the union of person: and therefore, if they were admitted to be witnesses *for* each other, they would contradict one maxim of law, *'nemo in propria causa testis esse debet'* [no man may testify in his own cause]; and if *against* each other, they would contradict another maxim, *'nemo tenetur seipsum accusare,'*[no man can be compelled to incriminate himself]."

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 431 (Spec. ed.1983) (emphasis in original). *See also O'Connor*

---

**3.** Wigmore had little use for Coke's view. Noting that there is no reference to such a disqualification until Coke's treatise appeared in 1628, he suggests that it may have been Coke's own creation. As to the validity of the principle, Wigmore states that "[h]e mouthed a few Latin words of medieval scholasticism, and suggested a consideration doubtful in its morality and narrow in its view of human nature." 8 WIGMORE, *supra,* § 2228, at 214. Coke's invocation of the unity and identity of married persons, echoed later by Matthew Hale, Wigmore regards as "merely appeal[ing] to a fiction." *Id.* at 216.

v. *Marjoribanks,* 134 Eng. Rep. 179, 182 (C.P.1842); *The King v. Cliviger,* 100 Eng. Rep. 143 (1788).

Although the disqualification enunciated by Coke extended beyond both marital communications and knowledge acquired as a consequence of the marital relationship and was stated in absolute terms, it was limited in some respects and was always subject to some exceptions. As both Greenleaf and Wigmore point out, it applied only when the husband or wife was a party to the suit in which the other was called as a witness and did not extend to collateral proceedings between third parties, and, from the earliest time, a wife was permitted to testify against her husband when she was the victim of his criminal conduct. 8 WIGMORE, *supra,* § 2227, at 213 (citing *Lord Audley's Case,* 23 Eng. Rep. 1140, 1141 (1631)), in which the court held that a wife may be a witness against her husband "for rape upon her, instigated by him." *See also* SIMON GREENLEAF, GREENLEAF ON EVIDENCE § 176, at 247 (1st ed. 1842); 1 BLACKSTONE, *supra,* at 431.[4] That exception was also recognized under Maryland common law. *See Hanon v. State,* 63 Md. 123, 125–26 (1885) acknowledging "[t]he principle of necessity, by which under the common law a wife is permitted to testify against her husband on a charge affecting her liberty or person."

---

4. Wigmore ascribes this exception to simple necessity, observing that "[a]nyone could see that an absolute privilege in a husband to close the mouth of the wife in testimony against him would be a vested license to injure her in secret with complete impunity." 8 WIGMORE, *supra,* § 2239, at 242. How far beyond criminal acts committed against the wife the common law exception extended is not clear. Wigmore notes that "[i]n orthodox practice, in proceedings involving the *custody of children,* where the issue depends partly on the husband's misconduct, the wife's testimony, at least by affidavit, was conceded to be admissible." *Id.* at 247–48 (emphasis in original). He observes that no such exception was recognized in divorce actions, however, and that the ability of spouses to provide adverse testimony in such actions derives either from total or partial abrogation of the disqualification or from special statute. *Id.* at 250. That would not have been a problem in Maryland until after 1851. Prior to then, divorces were granted by the General Assembly, not the courts, by special private bills. *See* CARL N. EVERSTINE, THE GENERAL ASSEMBLY OF MARYLAND 1776–1850, at 412–14 (1982).

Although the disqualification remained tied, at least in part, to the fiction of husband and wife being a single entity with a presumed self-interest, it began, in time, to acquire as well a public policy rationale. Writing in 1842, Greenleaf observed that the exclusion of spouses as witnesses "is founded *partly* on the identity of their legal rights and interests; and *partly* on principles of public policy, which lie at the basis of civil society." GREENLEAF, *supra*, § 334, at 384 (emphasis added). *See also* W.M. BEST, THE PRINCIPLES OF THE LAW OF EVIDENCE § 586, at 730 (5th ed. 1870).

A specific preclusion of testimony disclosing communications made between husband and wife during their marriage, even after the parties were divorced, was recognized at least by 1824 in England, although it is not clear whether that was the product of an independent rule focusing on marital communications or an extension of the general disqualification to cover testimony given after the parties were divorced. In *Doker v. Hasler*, 171 Eng. Rep. 992 (1824), Chief Judge Best recalled a case in which "Lord Alvanley refused to allow a woman, after a divorce, to speak to conversations which had passed between herself and her husband, during the existence of the marriage." *Id.* at 992. Judge Best announced his concurrence with such a rule, noting that "the happiness of the marriage state requires that the confidence between man and wife should be kept for ever inviolable." *Id.* In his 1842 work, Greenleaf noted that the general marital disqualification operated even if, at the time of trial, the party and the witness were no longer married, and he offered as a rationale for that extension that "[t]he great object of the rule is to secure domestic happiness, by placing the protecting seal of the law upon all confidential communications between husband and wife; and whatever has come to the knowledge of either, by means of the hallowed confidence." GREENLEAF, *supra*, § 338, at 386. He analogized the exclusion, "in its spirit and extent," to the attorney-client privilege. *Id.* In essence, he was stating the same rationale for a narrower, more focused, rule that was enunciated by Chief Judge Best—a rule much more akin to a privilege than to a lack of competence to testify.

Notwithstanding these precursors, the general spousal disqualification continued to operate until modified by statute, and it was largely through those statutes that the narrower rule precluding disclosure of marital communications came into the law. As both Wigmore and McCormick point out, so long as the disqualification operated, there was no practical need for a separate rule dealing just with confidential marital communications. 8 WIGMORE, *supra,* § 2233, at 644; 1 McCORMICK ON EVIDENCE § 78, at 324. The statutory march began in 1851 with 14 & 15 Vict. c. 99 § 2, which partially abolished the disqualification of parties and declared that, in civil actions, the parties were competent and compellable to give evidence on behalf of either party. The next step was taken two years later with the enactment of the Evidence Amendment Act of 1853, 16 & 17 Vict. c. 83. §§ 1–3. In that Act, Parliament declared, in relevant part, that (1) except as otherwise provided, the husbands and wives of the parties were competent and compellable to give evidence on behalf of either or any of the parties in any civil case, (2) nothing in the Act rendered any husband or wife competent or compellable to give evidence for or against the other in any criminal action, and (3) "[n]o Husband shall be compellable to disclose any Communication made to him by his Wife during the Marriage, and no Wife shall be compellable to disclose any Communication made to her by her Husband during the Marriage." [5] That last provision, which dealt only with compellability, appears to be the first statutory articulation of the confidential marital communication rule.

Many of the American States followed the lead of Parliament. As we observed in *Coleman v. State, supra,* 281 Md. at 542, 380 A.2d at 52, "when a trend appeared, in the period

---

5. The disqualification of criminal defendants to testify was repealed in 1898. 61 & 62 Vict. c. 36. The Act made defendants and their spouses competent witnesses, but (1) made the defendant a non-compellable witness, (2) precluded the spouse from testifying except upon application of the defendant, and (3) declared that nothing in the Act made a husband or wife compellable to disclose any communication made by him or her to the other during the marriage.

from 1840 to 1870, to abolish or restrict these common law marital disqualifications, the present privilege for confidential communications between spouses was enacted." The Maryland General Assembly first dealt with the matter by 1864 Md. Laws, ch. 109, in which it rewrote the first five sections of the existing Evidence Code (then Article 37 of he Maryland Code). In new § 1, the Legislature abolished the common law rule precluding testimony by parties on account of their presumed self interest and declared instead that no person offered as a witness shall be excluded by reason of incapacity from crime or interest from giving evidence in any suit, civil or criminal. It specified that, in any such action, the parties litigant "and their wives and husbands shall be competent and compellable to give evidence in the same manner as other witnesses, except as hereinafter excepted." In a new § 3 added to Article 37, the Legislature set forth a number of exceptions to that new doctrine. It first retained the rule that a defendant in a criminal case was neither competent nor compellable to give evidence for or against himself. It then stated, with respect to spousal testimony:

"[N]or, in any criminal proceeding, shall any husband be competent or compellable to give evidence for or against his wife, nor shall any wife be competent or compellable to give evidence for or against her husband, except as now allowed by law, nor *in any case, civil or criminal,* shall any husband be *competent or compellable* to disclose any communication made to him by his wife during the marriage, nor shall any wife be *compellable* to disclose any communication made to her by her husband during the marriage."

(emphasis added).

In 1876, the Legislature rewrote § 3 of Article 37. The main purpose of the 1876 amendment seems to have been to remove the disqualification of defendants to testify in their own behalf (but to continue their status as non-compellable witnesses), but, in rewriting the section the Legislature repealed the provisions enacted in 1864 regarding spousal testimony. It simply declared defendants to be competent witnesses but stated that the neglect or refusal of a defendant to

testify shall not create any presumption against him. *See* 1876 Md. Laws, ch. 357.

We considered the effect of the 1876 amendment in *Turpin v. State*, 55 Md. 462 (1881). Turpin, accused of murder, called his wife as a defense witness and complained when the court declared her incompetent to testify. He argued that, under § 1 of Article 37, as rewritten in 1864, his wife would have been a competent and compellable witness, that it was only the provisions of § 3 that precluded her from testifying, and that the repeal of those provisions in § 3 by the 1876 Act left § 1 in full force. We found no merit in that argument, noting that the purpose of the 1864 Act was to remove the incapacity of persons called to testify arising from crime or their interest in the action, but that "the incompetency of a husband or wife to testify for or against each other in a criminal proceeding at the common law arose not from interest in the result of the suit, but was based upon considerations of public policy, growing out of the marital relation." *Id.* at 477–78. Effectively, we adopted the Greenleaf rationale for the disqualification rule rather than that posited by Coke. We thus held that § 1 of Article 37, standing alone, "would not operate to alter the rule of the common law which made a husband or wife an incompetent witness in a criminal prosecution against the other." *Id.* Section 1, we declared, applied only to civil actions and had no reference to criminal cases. The only effect of the 1876 amendment to § 3, we said, was to permit defendants to testify in their own behalf and not to remove "the incompetency of the wife, which existed at the common law, to testify in the case of a criminal prosecution against her husband." *Id.* at 478. *Compare Classen v. Classen,* 57 Md. 510 (1882), holding that a wife was competent to testify against her husband in a civil case.

Perhaps as a result of *Turpin,* the provisions regarding spousal testimony were restored by 1888 Md. Laws, ch. 545. That Act added back to § 3 of Article 37 the provision that, "[i]n all criminal proceedings the husband or wife of the accused party shall be competent to testify," but that "in no case, civil or criminal, shall any husband or wife be competent

to disclose any confidential communication made by the one to the other during the marriage."

As a result of the 1888 amendment, the law, as ultimately codified in Maryland Code Article 35, §§ 1 and 4 (1957) was that (1) spouses were generally competent and compellable witnesses; (2) in criminal proceedings, the spouse of the defendant was "competent to testify," but (3) "in no case, civil or criminal, shall any husband or wife be competent to disclose any confidential communication made by the one to the other during the marriage." The law remained in that state until 1965, when the Legislature added to what was then § 4 of Article 35 the provision that a person could not be compelled to testify as an adverse party or witness in any criminal proceeding involving the person's spouse. In enacting CJP, the Legislature further divided these provisions into separate sections. The general competence and compellability of spouses to testify was stated in § 9–101. The non-compellability of a spouse to testify as an adverse witness in a criminal case was placed in § 9–106, and the preclusion against the disclosure of confidential marital communications was stated in § 9–105.

What we see from this development is the legislative replacement of an actual disqualification, that had a shaky origin and was based ultimately on the common law fiction that a married woman had no separate legal status as an individual, with a much more narrowly focused rule that rested solely on the public policy objective of preserving confidences shared between husband and wife. Section 9–105 is not based, and never was based, on a notion of the true incompetence of a spouse as a witness. The seeds of this can be traced at least to Greenleaf, in 1842, who, having given a public policy rationale for the exclusion of marital confidences, treated the exclusion, "in its spirit and extent," as analogous to the exclusion of confidences made by a client to his or her attorney. GREENLEAF, *supra*, § 338, at 386. The *Trammel* Court regarded the exclusion as a "privilege for confidential marital communications." *Trammel, supra*, 445 U.S. at 47,

100 S.Ct. at 911, 63 L.Ed.2d at 193.[6] Although in *State v. Enriquez*, 327 Md. 365, 373, 609 A.2d 343, 346 (1992), we, in one passage, declared a wife "incompetent under the statute to divulge the marital communication over her husband's objection," we otherwise consistently referred to § 9–105 as conferring a statutory marital communication "privilege," *id.* at 367, 369–73, 609 A.2d at 343–46, which is consistent with how we characterized the statute in *Gutridge v. State*, 236 Md. 514, 517, 204 A.2d 557, 559 (1964); *Coleman, supra,* 281 Md. at 541–546, 380 A.2d at 51–54; and *State v. Mazzone*, 336 Md. 379, 384, 648 A.2d 978, 980 (1994).

Every major commentator on the law of evidence has characterized statutes limiting or precluding the disclosure of marital communications as conferring a "privilege," and as not rendering a spouse actually incompetent, notwithstanding the language used in the statute. Wigmore, throughout his discussion of the rule embodied in § 9–105, refers to it as a privilege, declaring it "plainly different" from the discarded common law disqualification. 8 WIGMORE, *supra,* § 2334, at 645. He notes in particular that "[p]erhaps the commonest error caused by the confusion with the moribund marital disqualification was the ignoring of the right of the communicating spouse to *waive* the privilege in his own behalf." *Id.* (emphasis in original). In § 2340, at 671, he confirms that "[t]he spouse possessing the privilege may of course *waive* it." (emphasis in original). McCormick agrees that the preclusion is a rule of privilege, not incompetence, and observes:

> "Many legislatures ... when they came to write the privilege into law phrased the rule simply as a survival in this special case of the ancient incompetency of the spouses,

---

**6.** *Trammel* dealt principally with the asserted ability of a defendant to preclude any adverse testimony by his or her spouse, which the Supreme Court also regarded as a "privilege," indeed noting from the historical development that "[t]he rule thus evolved into one of privilege rather than one of absolute disqualification." *Trammel, supra,* 445 U.S. at 44, 100 S.Ct. at 909, 63 L.Ed.2d at 191. Its characterization of the exclusion of marital communications as a privilege was part of its discussion of the development of Fed.R.Evid. 501.

which the same statutes undertook to abolish or restrict. So it is often provided that spouses are 'incompetent' to testify to marital communications. Consequently, the courts frequently overlook this 'common law' background of privilege, and permit any party to the action to claim the benefit of the rule by objection. Doubtless counsel often fail to point out that privilege, not incompetency, is the proper classification, and that the distinctive feature of privilege is that it can only be claimed by the holder or beneficiary of the privilege, not by a party as such. The latter principle is clearly correct."

1 McCormick, *supra*, § 83, at 335–36.

Jones parrots McCormick's view, agreeing that statutes sometime "couch privileges in terms of incompetency, a definite misconception." Spencer A. Gard, Jones On Evidence § 21:7, at 760 (6th ed.1972). He adds that, as applied to husband and wife, "this terminology is not surprising as the privilege against disclosure of confidential communications is often regarded as a survival of the common law rules of incompetency arising out of the marriage relation." *Id.*[7] Jones agrees, however, that "it is not truly such as the privilege rule came into existence in the place of the more drastic rules of complete disqualification." *Id. See also* Scott N. Stone & Robert K. Taylor, Testimonial Privileges § 5.02, at 5–3 (2d ed. 1993) ("The absolute disqualification on the ground of incompetence, which is retained in only a few states, is based upon archaic notions of the nature of the marital relationship and the role of women.").[8] The two preeminent commentators on Maryland evidence law also regard § 9–105 as creating only a privilege. *See* Lynn McLain, Maryland

---

**7.** An example of how loosely or ambiguously the term "competent" is used in statutes of this kind is the Pennsylvania statute, 42 Pa. Cons.Stat Ann. § 5914 (West 1982), which provides that, in a criminal proceeding, "neither husband nor wife shall be *competent or permitted* to testify to confidential communications made by one to the other, *unless this privilege is waived* upon the trial." (Emphasis added).

**8.** Interestingly, Stone and Taylor do *not* list Maryland as one of the States retaining the absolute disqualification.

EVIDENCE § 505.2, at 548–51 (1987 & 1995 Supp.); JOSEPH F. MURPHY, MARYLAND EVIDENCE HANDBOOK § 903(B), at 377–79 (3d ed.1999).

As Stone and Taylor point out, the notion that spouses are actually "incompetent" to testify to confidential marital communications exists today only in a few States. Most States have either written or rewritten their statutes or adopted rules of evidence to make clear that the preclusion is but a privilege, so judicial construction on that issue is not required. Massachusetts has construed its statute literally. In *Commonwealth v. Cronin*, 185 Mass. 96, 69 N.E. 1065 (1904), the defendant, in support of his plea of insanity to a charge of murder, offered the testimony of his wife that he suffered from epilepsy and that, two days before the murder, upon recovery from an attack, he told her that he intended to drown himself. The court affirmed the exclusion of that evidence, notwithstanding that it was favorable to and solicited by the defendant, on the ground that it was a private communication and barred by the statute declaring that neither husband nor wife "shall testify as to private conversations with each other." *Id.* at 1066. *See also Commonwealth v. Spencer*, 212 Mass. 438, 99 N.E. 266 (1912).

In *Gallagher v. Goldstein*, 402 Mass. 457, 524 N.E.2d 53 (1988), a medical malpractice action by a wife who had been rendered mentally incompetent and unable to testify, the husband was precluded from testifying to a conversation occurring prior to the wife's visit to the defendant doctor in which she related the list of symptoms she intended to discuss with defendant doctor, on the ground that contents of private communications were absolutely excluded. The court construed the Massachusetts statute as rendering private communications between spouses inadmissible "even if both spouses desire the evidence to be admitted." *Id.* at 54. In doing so, it recognized that the underpinnings of a disqualification rule had "fallen in extreme disfavor among courts and commentators alike," that such a rule "may be viewed as a statutory preservation of a remnant of an outdated common law concept" and that "[i]t seems imprudent to prohibit testimony as

to a marital conversation when both parties to the conversation want disclosure and the interests of the marital unit would be furthered by disclosure." *Id.* at 55. The court nonetheless felt bound by its prior decisions construing the statute strictly.

Maine, Iowa, Ohio, Missouri, and the District of Columbia have taken a different approach. In *State v. Benner,* 284 A.2d 91, 103 (Me.1971), the court construed a statute providing that the spouse of an accused "is a competent witness except in regard to marital communications." The court concluded that the exception for marital communications was in the nature of a privilege, not an incompetence, and that the privilege, "when appropriately claimed, functions to protect against the testimonial disclosure by a spouse of specific matters connected with the marital relationship." *Id.* at 107. The court reached that conclusion after examining, as we have, the derivation and purpose of the statute, noting particularly the legislative removal of the absolute disqualification imposed by the common law. In *State v. Hastings,* 466 N.W.2d 697 (Iowa Ct.App. 1990), the statute at issue stated, in relevant part, that neither husband nor wife "can be examined in any case as to any communication made by the one to the other while married." *Id.* at 699. The court viewed that statute as a "marital privilege statute," providing a privilege that could be waived by its holder. In the particular case, the court held that the privilege was not waived by the defendant.

In an early case, Ohio had construed its marital communication statute strictly. *See Dick v. Hyer,* 94 Ohio St. 351, 114 N.E. 251 (1916) (wife, sued with husband on promissory note, precluded from testifying that she signed note at her husband's request). In *State v. Adamson,* 72 Ohio St.3d 431, 650 N.E.2d 875, 877 (1995), however, the court construed the statute, stating, in relevant part, that a husband or wife "shall not testify concerning a communication made by one to the other" as creating a spousal privilege rather than a spousal incompetency. In *Johnson v. United States,* 616 A.2d 1216, 1219 (D.C.1992), the court construed a District of Columbia statute providing that "a husband or his wife *is not competent*

to testify as to any confidential communications made by one to the other during the marriage" as a privilege. (Emphasis added). *See also State v. Bledsoe,* 325 S.W.2d 762 (Mo.1959).

■ The Massachusetts cases illustrate well the consequences of viewing § 9–105 as declaring an incompetence rather than a privilege. The *Gallagher* court candidly recognized those consequences but apparently felt bound by its prior holdings. We do not have that impediment and will not create it now. As the Pennsylvania statute and the decisions in Maine, Iowa, Ohio, and the District of Columbia indicate, use of the word "competent" in a statute like § 9–105 should not, and sometimes cannot, be taken literally.[9] To construe § 9–105 as imposing an absolute disqualification would be to ignore the paramount legislative intent to abrogate, rather than preserve, the common law antecedent, to tie our law to a rationale that was of dubious validity in 1628 and that has, in any event, long since been discarded in this and almost every other State, and to create consequences that make utterly no sense. We therefore hold that § 9–105 does not render a spouse "incompetent" in any manner, but simply provides a privilege, exercisable and waivable by the person who made the confidential communication, to preclude the person's spouse from disclosing that communication through testimony.

### Was The Privilege Waived?

■ Although we have declared § 9–105 as creating a privilege, rather than an incompetence, it is an important privilege, with a solid public policy underpinning, and is not to

---

**9.** There is, indeed, some evidence of a legislative recognition in Maryland that § 9–105 confers only a privilege. In its first reader form, the bill that was enacted as the Domestic Violence Act of 1994 (1994 Md. Laws, ch. 728), would have amended § 9–105 to add an express exception for communications occurring during the commission of a crime by one spouse upon the other. Although that part of the bill was stricken during the legislative process, the Floor Report of the Senate Judicial Proceedings Committee on the bill (Senate Bill 279) characterized § 9–105 as conferring "a privilege to refuse to disclose, and to prevent that spouse from testifying to, the content of those [confidential] communications."

be found waived except in the clearest of circumstances. In *Coleman* and *Enriquez*, we emphasized that confidence was essential to the marital relationship, that that relationship was a proper subject of encouragement by the law, and that "the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth." *Coleman, supra*, 281 Md. at 541, 380 A.2d at 52; *Enriquez, supra*, 327 Md. at 372, 609 A.2d at 346. In both cases, we noted that there were no exceptions to the statute.

The Circuit Court ultimately held Ms. Brown's disclosure of petitioner's confession admissible on the authority of *Harris, supra*, 37 Md.App. 180, 376 A.2d 1144. In that case, the Court of Special Appeals drew from some language used in *Gutridge, supra*, 236 Md. 514, 204 A.2d 557, a conclusion that the privilege embodied in § 9–105 was "inapplicable" when the confidential communication "constitutes a threat or crime against the other spouse." *Harris, supra*, 37 Md.App. at 184, 376 A.2d at 1146. Relying on its decision in *Coleman v. State*, 35 Md.App. 208, 370 A.2d 174 (1977), which we reversed in *Coleman, supra*, 281 Md. 538, 380 A.2d 49, the *Harris* court concluded that when the communication in question runs contrary to the promotion of marital harmony and tranquility, the basis for the statute no longer prevails and, for that reason, the statute is inapplicable. In overturning the Court of Special Appeals decision in *Coleman*, we expressly rejected that rationale. *Coleman, supra*, 281 Md. at 544–45, 380 A.2d at 53–54.

The Court of Special Appeals, in this case, did not rely on *Harris*, and for good reason. Even to the extent that *Harris* may be correct in its holding that a communication that, itself, constitutes a crime or a threat is not subject to the privilege, the confession made by petitioner to his wife did not, itself, constitute either a crime or a threat to her and was not necessarily contrary to the promotion of marital harmony. *Harris* serves as no authority for the admissibility of Ms. Brown's disclosure. The intermediate appellate court relied instead upon a Colorado case, *Cummings v. People*, 785 P.2d

**204**

920 (Colo.1990) for the proposition that the assertion of a "my spouse did it" defense constitutes a waiver of the privilege. That, as noted, is the position now asserted by the State.

Because *Cummings* relied, in part, on a California case, *People v. Worthington*, 38 Cal.App.3d 359, 113 Cal.Rptr. 322 (1974), we shall begin with *Worthington*. The defendant was convicted of murdering two people—a mother and her daughter—with whom he and his wife had stayed for a time and with whom they had developed an antipathy. On appeal, he complained that the trial court allowed his wife to testify about his confession to her that he had killed the victims. That testimony, he argued, was inadmissible under the California equivalent to § 9–105 (Evidence Code, § 980), affording a spousal privilege to refuse to disclose and prevent another from disclosing a communication made in confidence during the marriage. Before the court allowed the wife to testify, a detective testified that the defendant had informed him that the defendant's wife killed the two victims and had described in some detail how the killings took place—an account that the appellate court regarded as a mirror image of the wife's ultimate testimony, but with their roles reversed. The privilege afforded by § 980 was expressly made subject to another statute (Evidence Code. § 912) declaring the privilege waived "if any holder of the privilege, without coercion, has disclosed a significant part of the communication." *Worthington*, 38 Cal.App.3d at 365, 113 Cal.Rptr. 322.

The appellate court affirmed the decision to allow the wife's testimony. It found "incredible" that the "defendant could fail to realize that in disclosing what he claimed the wife had told him, a confession of murder, he was inviting a response from the wife *as to her version of the conversation*," adding that "it would be the ultimate irony if one spouse can, under the guise of 'squealing' on the other, silence the other's response to his charges." *Id.* at 365, 113 Cal.Rptr. 322 (Emphasis added). Furthermore, the court declared, "there was an abundance of evidence before the trial court upon which it could, as it did, make a finding that defendant had himself disclosed a signifi-

cant, if twisted, version of his conversation with his spouse." *Id.* at 365–66, 113 Cal.Rptr. 322.

In *Cummings,* the defendant also was convicted of murdering two people. The evidence established that the murders took place in the home where the defendant and his wife lived. He and his wife each claimed that the other committed the murders. Cummings was charged with the murders and his wife was charged as an accessory. During opening statement, defense counsel asserted that the wife was the killer and that the defendant was the accessory—simply "trying to protect a loved one." *Cummings,* 785 P.2d at 922. Based on that statement, the court found that he had waived his privilege under Colorado law to preclude adverse testimony by his spouse. The privilege invoked was not the one dealing with confidential communications. Nonetheless, citing *Worthington* and a number of Colorado decisions finding that the privilege asserted was waivable, the court held that "[b]y accusing his wife of the murders, the defendant invited a response which necessarily could have come only from her." *Id.* at 927.

 Neither of those cases supports a finding of waiver in this case. The waiver in *Worthington* was based essentially on a finding that the defendant had himself disclosed a version of the conversation, and he could not then complain when the wife was allowed to give her version of it. Self-disclosure of an otherwise confidential communication is generally regarded as a waiver of the privilege. *See* 8 WIGMORE, *supra,* § 2340, at 671; McCORMICK, *supra,* § 83, at 336; STONE & TAYLOR, *supra,* § 5.12, at 5–28. *See also State v. Bledsoe, supra,* 325 S.W.2d 762, 766 (when defendant testifies to confidential marital communication from wife, no error in allowing wife to testify in rebuttal). Nothing said by petitioner or his attorney prior to Ms. Brown's testimony could be taken as revealing any part of the conversations testified to by Ms. Brown. *Worthington* is wholly inapposite.

*Cummings,* with all due respect to the Colorado court, is not particularly well-reasoned. It begins with a far more

# 206

general statement, taken from an earlier case, that the holder of the privilege "will not be permitted to 'absolve himself from liability and at the same time assert the privilege in order to prevent the other party from ascertaining the truth of the claim.'" *Id.* at 926 (quoting *Clark v. District Court*, 668 P.2d 3, 8 (Colo.1983)). *Clark* had nothing to do with the privilege for confidential marital communications. The issue was whether a defendant in a wrongful death action waived his psychiatrist-patient privilege by denying liability, and the court held that he had not done so. The court noted that, when the privilege holder asserts his or her physical or mental condition as the basis of a claim or defense, the person implicitly waives any claim of confidentiality respecting that condition, but held in *Clark* that the defendant had done nothing to waive his privilege. Apart from *Worthington*, the other cases cited by the *Cummings* court all dealt with waivers based either on a failure to object to the evidence or on the person himself (or herself) offering evidence of the communication.

The State makes too large a leap in arguing from these cases the broad proposition that a "my spouse did it" defense, however asserted, suffices to waive the privilege afforded by § 9–105. Depending on the circumstances, a waiver may be found from a failure to object or from a voluntary self-disclosure of the conversation, but a "my spouse did it" defense itself does not invoke a waiver. In this case, although petitioner did not immediately object to Ms. Brown's statement on the ground of privilege, neither the Circuit Court nor the Court of Special Appeals found a waiver on that basis. Nor shall we. Petitioner did eventually raise the statutory privilege, which was entertained and ruled upon by the court. Nor, as we have indicated, did petitioner himself disclose any part of the conversation with his wife prior to her testimony. There was no waiver.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-

CUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.

BELL, C.J., and CATHELL, J., concur.

BELL, Chief Judge, Concurring:

The majority holds that Maryland Code (1973, 1998 Repl. Vol.) § 9–105 of the Courts and Judicial Proceedings Article [1] codifies a confidential marital communications privilege, under which a spouse, or former spouse may not disclose, or be compelled to disclose, over objection and absent a waiver, any confidential marital communications. 359 Md. 180, 201, 753 A.2d 84, 95 (2000). It holds, nevertheless, that the "privilege" was not waived in this case and, thus, reverses the petitioner's conviction. I agree with that result. Accordingly, I concur in the result. We have arrived at the same result by different routes, however; indeed, in reaching my conclusion, I embrace a rationale that the majority expressly rejects: § 9–105 is a competency statute, rather than one setting forth a privilege. Whether I or the majority is correct involves statutory interpretation.

Section 9–105 is broadly, but clearly, written. It is well settled that the interpretative process, the purpose of which is to ascertain and effectuate the intent of the legislature, *Parrison v. State*, 335 Md. 554, 559, 644 A.2d 537, 539 (1994), begins, and, when the words of the statute are clear and unambiguous, according to their ordinary and commonly understood meaning, *see Chesapeake and Potomac Telephone Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore*, 343 Md. 567, 578, 683 A.2d 512, 517

---

1. Although § 9–106 is not at issue in this case, Judge Cathell would hold that it, and not § 9–105, is the competency statute. As will become apparent, I see this differently as well, and for the same reason essentially that I part company with the majority with respect to the interpretation of § 9–105, the plain language of § 9–106 belies the interpretation Judge Cathell gives it.

(1996); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995); *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448, 451 (1994), ordinarily ends, with the words of the statute. *Farris v. State,* 351 Md. 24, 29, 716 A.2d 237, 240 (1998). It is true, of course, that the legislative history of the enactment may be taken into account, but only to confirm, not to contradict, the result derived from according the words of the statute their commonly understood meaning. *See Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977).

Headed "Testimony by Spouses—Confidential communications occurring during marriage," § 9–105 provides that, "One spouse is not competent to disclose any confidential communications between the spouses occurring during their marriage." Black's Law Dictionary 1596 (7 [th] ed.1999) defines a "competent witness" as "a witness who is legally qualified to testify," and, by extension, based on the definition of "incompetency"— "the lack of legal ability in some respect, especially to testify," *id.* at 768, an incompetent witness is one legally disqualified to testify. Section 9–105 thus clearly and unambiguously declares one spouse unable to testify against the other as to confidential marital communications.[2] The words used leave no doubt as to the Legislature's intention; they provide no basis for construing the statute to mean that a spouse has a privilege not to testify as to confidential marital discussions, a privilege that may be waived.

The logic of this interpretation is underscored and confirmed when § 9–105 is contrasted with § 9–106.[3] That latter section provides:

---

**2.** Judge Cathell recognizes that the language used is inconsistent with privilege:

"But for the continuing viability of the "spousal incompetency" concept by statute, the plain language of this statute might infer that section 9–105 is a statute based on competency. The history of the statutes [§§ 9–105 and 9–106], however, as I have indicated, is otherwise."

359 Md. at 234, 753 A.2d at 113 (Cathell, J., concurring).

**3.** There is no inconsistency between the two statutes. Section 9–105 makes explicit the incompetence of a spouse to testify concerning

"(a) The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves:

"(1) The abuse of a child under 18; or

"(2) Assault in any degree in which the spouse is a victim if:

"(i) The person on trial was previously charged with assault in any degree or assault and battery of the spouse;

"(ii) The spouse was sworn to testify at the previous trial; and

"(iii) The spouse refused to testify at the previous trial on the basis of the provisions of this section."

Unlike § 9–105, this section speaks in terms of "compellability," suggesting that it addresses a privilege. It clearly and unambiguously prohibits the spouse of a defendant on trial from being compelled to testify as an adverse witness except in certain enumerated and well defined circumstances. Thus, the statute allows the witness spouse to elect, but not be compelled, to testify as an adverse witness. The "privilege" not to testify belongs to the witness spouse, who is not disqualified, by the terms of the statute, from testifying against his or her spouse. This comparison demonstrates that § 9–106 is clearly not a competency statute and that § 9–105 is clearly not a privilege statute. As the petitioner points out, "section 9–105 addresses when a spouse is a competent witness, and section 9–106 addresses when a spouse is a compellable witness." The comparison also demonstrates that the Legislature knows the difference between such statutes. I think that it is most significant that both statutes are found in the subtitle headed "Competence, Compellability, and Privi-

confidential marital communications, while § 9–106 addresses a completely different subject, the spouse's compellabilty as a witness. In any event, we are required to interpret the statutes as to give effect to both, but without doing violence to the meaning of either. *See Blitz v. Beth Isaac Adas Israel Congregation*, 352 Md. 31, 40, 720 A.2d 912, 916 (1998), and cases cited therein.

lege" and that, although using absolute language in both, the Legislature used "competent" in one and "compelled" in the other. I am also struck by the fact that the first four sections · of the subtitle, including § 9–105,[4] involve the qualification of a witness to testify, either in general or in a particular instance, see § 9–101 (competency in general);[5] § 9–103 (child testimony in a criminal case);[6] § 9–104 (convicted perjurer);[7] § 9–105 (spouse testimony confidential communications), and that, with one exception, § 9–113 (adverse party witness),[8] the remaining sections address privilege or when a particular witness may be compelled to testify. See § 9–107 (defendant as a witness);[9] § 9–108 (attorney-client privilege);[10] § 9–109

---

**4.** Maryland Code (1973, 1998 Repl.Vol.) § 9–102 and § 9–103.1 of the Courts and Judicial Proceedings Article, pertaining, respectively, to the testimony of child abuse victims by closed circuit television and the admissibility of the out of court statements of child abuse victims, were transferred, by Acts 1996, c. 585, § 5, eff. Oct. 1, 1996, to Maryland Code (1957, 1998 Repl.Vol.) Article 27, §§ 774 and 775, respectively. This legislative action buttresses my argument; by moving these sections from the subtitle and, in particular the first section of it, the Legislature left intact the scheme contemplated by the heading.

**5.** Section 9–101 provides:
"Unless otherwise provided in this subtitle:
"(1) A person shall not be excluded from testifying in a proceeding because of incapacity from crime or interest in the matter in question.
"(2) Litigants and their spouses are competent and compellable to give evidence."

**6.** Section 9–103 provides:
"In a criminal trial, the age of a child may not be the reason for precluding a child from testifying."

**7.** Section 9–104 provides:
"A person convicted of perjury may not testify."

**8.** Section 9–113 provides that "[I]n a civil case, a party or an officer, director, or managing agent of a corporation, partnership, or association may be called by the adverse party and interrogated as on cross-examination."

**9.** Section 9–107 provides:
"A person may not be compelled to testify in violation of his privilege against self-incrimination. The failure of a defendant to testify in a

(patient/psychiatrist or psychologist privilege); § 9–110 (accountant privilege); § 9–111 (clergy privilege);[11] § 9–112 (news media); § 9–121 (licensed social worker/client privilege); § 9–123 (witness immunity for compulsory testimony).

I am not persuaded by the majority's reliance on dicta in *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977), and *State v. Enriquez*, 327 Md. 365, 609 A.2d 343 (1992), the historical analysis or cases from other jurisdictions to support the conclusion that § 9–105 is a privilege statute. In neither *Coleman* nor *Enriquez* was the issue in this case, the nature of § 9–105, presented. Thus, the characterization we gave the statute sheds absolutely no light on the Legislative intent in enacting it. The historical analysis and the cases from other jurisdictions overlook or, at least, undervalue the plain language and clarity of the statute. It is the legislative intent that is sought to be determined. That is best determined by reference to the words that body used in enacting it. As this is a case of first impression in this Court, it simply is inappropriate to ascribe a legislative intent contrary to the statute's plain, clear and unambiguous language, no matter how tight the logic or persuasive the reasoning may appear to be. *See, Farris v. State*, 351 Md. 24, 28, 716 A.2d 237, 240 (1998); *Briggs v. State*, 348 Md. 470, 477, 704 A.2d 904, 908 (1998); *Gargliano v. State*, 334 Md. 428, 435, 639 A.2d 675, 678 (1994); *Williams v. State*, 329 Md. 1, 616 A.2d 1275 (1992); *Dickerson v. State*, 324 Md. 163, 170–71, 596 A.2d 648, 651 (1991); *State v. Bricker*, 321 Md. 86, 92, 581 A.2d 9, 12 (1990); *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987); *Jones v. State*, 304 Md. 216, 220, 498

criminal proceeding on this basis does not create any presumption against him."

10. I think it significant that in stating the privilege, the Legislature declared that "[a] person may not be *compelled* to testify in violation" of the privilege.

11. In stating the privilege, the Legislature again chose to use the "not be compelled to testify" language.

A.2d 622, 624 (1985); *Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977).

Treating § 9–105 as a competency statute is consistent with the purpose of shielding confidential marital communications from disclosure. That purpose was stated in *Coleman,* 281 Md. at 541, 380 A.2d at 51–52 (*citing* 8 Wigmore, Evidence, § 2332 (McNaughton rev.1961) and McCormick, Handbook of the Law of Evidence § 86 (2d ed.1972)):

> "[C]onfidential communications between husband and wife ... (1) ... originate in confidence, (2) the confidence is essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth. The essence of the privilege is to protect confidences only ... and thereby encourage such communications free from fear of compulsory disclosure, thus promoting marital harmony."

As the petitioner points out, "[t]he important institution of marriage is served by a 'bright-line' rule that legally ensures that confidential marital communication shall remain confidential marital communication."

The General Assembly has considered, and rejected, amendments to § 9–105 nine times since its enactment in 1973. It certainly will be able, if it believes that we have misconstrued its intent, to amend the statute. But it ought to be the General Assembly, not this Court that makes that determination; it is not the Court's intention or what the Court believes to be the best policy or approach that is at issue.

CATHELL, Judge, Concurring:

Although I concur with the result reached by the majority, I differ somewhat in how that result is reached.

While I disagree with some of the majority's analysis of the early English history of the competency and privilege issues, I shall not take the time to take issue with their treatment of that historical perspective.

Section 9–101 of the Courts & Judicial Proceedings Article states that "[u]nless otherwise provided in this subtitle ... [l]itigants and their spouses are competent and compellable to give evidence." Section 9–105 provides, however, that "[o]ne spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." And section 9–106, in relevant part, provides that "[t]he spouse of a person on trial for a crime may not be compelled to testify as an adverse witness...." [1] In seeking reversal of the Court of Special Appeals' opinion, petitioner proffers two arguments, which I rephrase and simplify: (1) section 9–105 is an unwaivable "competency" statute, not a waivable "privilege"; and (2) if section 9–105 does establish a privilege, then petitioner has not waived the privilege in this case. I am convinced that section 9–105 deals with privilege by virtue of the treatment of the issue by the General Assembly over the last hundred years or so.

Central to the arguments presented is the nature of section 9–105. Section 9–105, as I view it, cannot, in light of the history of testimonial limitations on spouses in Maryland and elsewhere, be resolved in a vacuum. The "competency" portion of Title 9, subtitle 1, entitled "Competency, Compellability, and Privilege," I believe, require, at a minimum, a balancing of those provisions relating to the competence of spousal witnesses to testify at all against the other spouse in a criminal proceeding and the privileges of spouses, generally, to decline to testify as to privileged communications or to prohibit the other spouse from testifying as to such confidential marital communications. This Court and the Court of Special Appeals have heretofore, for the most part, almost always addressed the issues of spouses testifying in cases involving the other spouse using the language of "privilege." In the cases, however, the parties generally have presented the disputes as matters of privilege and we have assumed, for the purposes of the cases, that the issues related to privilege only,

---

**1.** The exceptions to section 9–106 are not relevant in the case *sub judice*.

although in at least one case we have, in dicta, recognized the difference between competency and privilege in the context of spousal witnesses.

I note initially that the matter is treated in many different ways by other jurisdictions. Some conclude that both concepts are a matter of privilege either under the statutes of the jurisdictions or under the jurisdiction's common law. Some continue to recognized a distinction, but generally find in the individual cases that "privilege" is involved rather than competency. Some jurisdictions have interpreted their state's statutes and common law as relating exclusively to the matter of competency. I would start by defining the difference in the concepts.

"Spousal incompetency," sometimes referred to as "spousal disqualification," "spousal immunity," or the "prohibition against adverse spousal testimony," and sometimes even referred to as "spousal privilege," *see, e.g., People v. Fisher*, 442 Mich. 560, 566, 503 N.W.2d 50, 53 (1993), as relevant to the issues presented, is, generally, a rule of testimonial incompetency. The rule governs whether a spouse may testify at all in a judicial proceeding, i.e., appear as a witness against the other spouse (or for the spouse, according to some authorities) in a case in which the other spouse is a party. In most jurisdictions the issue is qualified by the right of either the testifying spouse, the other spouse, or both, to consent to such testimony. In a pure sense, however, and at least one jurisdiction has so held,[2] the prohibition against "spousal testimony" is absolute. In that jurisdiction, a spouse, during the marriage, could not testify at all, as to any issue, in a case in which the other spouse was a party. "Spousal incompetency," if applicable, only exists during the marriage. After the termination of the marriage, "spousal incompetency" is no longer at issue and the ex-spouse may testify, and be required to testify.

"Spousal privilege," also referred to as the "communications privilege," as relevant to the issues before the Court, is a

---

2. *See Gallagher v. Goldstein,* 402 Mass. 457, 524 N.E.2d 53 (1988).

prohibition against a spouse, or former spouse, being required, or permitted, to testify in a court proceeding, as to a confidential marital communication occurring during the marriage, over her or his objection or over the objection of the other spouse or former spouse. "Spousal privilege" survives the termination of the marriage.

As I commence an examination of the Maryland statute, I note initially the constraints of statutory construction. "The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995), *quoted in Board of License Comm'rs v. Toye,* 354 Md. 116, 122, 729 A.2d 407, 410 (1999). "As we often have said, the starting point for determining legislative intent is the language of the statute itself. Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887, 895 (1999) (citations omitted). In *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992), however, this Court opined that "the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears." (Citations omitted.) Thus, this Court is not constrained by the literal or usual meaning of the terms at issue. *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 808, 709 A.2d 1301, 1303 (1998). Rather, we must "interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted." *Lewis v. State,* 348 Md. 648, 654, 705 A.2d 1128, 1131 (1998) (citing *Gargliano v. State,* 334 Md. 428, 435, 639 A.2d 675, 678 (1994)).

In determining legislative intent, the Court may resort to the history behind the legislative enactment, *Welsh v. Kuntz,* 196 Md. 86, 93, 75 A.2d 343, 345 (1950); *Barnes v. State,* 186 Md. 287, 291, 47 A.2d 50, 52, *cert. denied,* 329 U.S. 754, 67 S.Ct. 95, 91 L.Ed. 650 (1946), as well as the development of

the enactment through the years. *See, e.g., C.S. v. Prince George's County Dep't of Soc. Servs.*, 343 Md. 14, 24, 680 A.2d 470, 475 (1996) (noting that "[i]t is often necessary to look at the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute." (quoting *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993) (alteration in original))). In reviewing the history of a statute, we must bear in mind that the Legislature is presumed to be aware of the common law as it stands at the time of the enactment and that the law is not intended to change the common law absent an express, specific declaration to do so. *See Hardy v. State*, 301 Md. 124, 131, 482 A.2d 474, 478 (1984) ("Maryland courts adhere to the policy that statutes are not to be construed to alter the common-law by implication." (citing *Bradshaw v. Prince George's County*, 284 Md. 294, 302, 396 A.2d 255, 260 (1979); *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 355–56 (1934))).

Most jurisdictions have interpreted the common law as recognizing the separate, though related, common law origins of the concepts of "spousal competency" and "spousal privilege." Some have adopted the position urged on us that such statutes are virtually always competency statutes.[3]

Maryland attempted, at one point, to abolish the concept of absolute incompetency, but in the process of enactments and re-enactments has used competency language to limit the effect of the abolition of the old common-law concept of "spousal incompetency" or "spousal disqualification." 1864 Maryland Laws, Chapter 109, section 1, provided, as relevant to the present issue:

> Sec. 3 .... nor, in any criminal proceeding, shall any husband be competent or compellable to give evidence for or against his wife, [and vice-versa], except as now allowed by law, nor in any case, civil or criminal, shall any husband be competent or compellable to disclose any communication

---

**3.** I have found no statutes in the other jurisdictions identical to the three sections of the Maryland subtitle described earlier, *supra*. The language of the Maryland statutes may be unique.

made to him by his wife during the marriage, [and vice-versa].

In my view, this statute codified both concepts. It was repealed by 1876 Maryland Laws, Chapter 357, section 1, which purported to repeal and re-enact section 3. The re-enacted statute was couched in general terms "the person so charged shall, at his own request but not otherwise, be deemed a competent witness...." As re-enacted, there were no specific provisions relating to husbands, wives, or spouses in general. 1888 Maryland Laws, Chapter 515, was, in part, "AN ACT to repeal and re-enact with amendments section three, of article thirty-seven...." The relevant portions of the re-enactment read: "In all criminal proceedings the husband or wife of the accused party shall be competent to testify; but in no case, civil or criminal, shall any husband or wife be competent to disclose any confidential communication made by the one to the other during the marriage...." *Id.* § 1. This statute declared spouses to be competent and reserved to spouses only the right to prohibit the disclosure of confidential marital communications. It, as I see it, abolished "spousal incompetency." Accordingly, at that time the Maryland statute was limited to the protection of confidential marital communications. This last language remained in the statutes through the 1951 codification. *See* Md.Code (1951), Art. 35, § 4. Through 1964 there was no "spousal incompetency" rule in Maryland. Spouses were completely compellable, i.e., competent, although they could not testify, over the objection of either, as to confidential communications.

The statutory history, as I interpret it, relating to this issue indicates the early existence of a "spousal incompetency" (or disqualification or immunity) rule, separate and distinct from the provisions forbidding the involuntary disclosure of confidential marital communications. Then, in 1888, the "spousal incompetency" rule was repealed from the statute. Up until 1965, the confidential marital communication provision remained in the statute and had been, for over seventy-five years, the only provision in respect to spousal testimony. Then, in 1965, the Legislature again repealed and re-enacted

the relevant statute, as I see it, for the sole purpose of re-establishing a modified "spousal incompetency" provision, which provided that a witness-spouse could not be compelled against his or her wishes to testify against the other spouse in a criminal case. In 1965, Maryland Laws, Chapter 835, provided:

AN ACT to repeal and re-enact, with amendments, Section 4 of Article 35 of the Annotated Code of Maryland (1957 Edition), title "Evidence," subtitle "Competency of Witness," to provide that a husband or wife is not compelled to testify as an adverse party or witness in a criminal action involving his or her spouse but may testify at his or her election only.

In the body of the statute only the following was added: "nor shall the husband or wife be compelled to testify as an adverse party or witness in any criminal proceeding involving his or her spouse." *Id.* § 1. By the time of the transfer of some of Article 35's "witness" provisions into the Courts & Judicial Proceedings Article during recodification in 1973 (*see* 1973 Sp. Sess., Md. Laws, Chap. 2, § 1), there was a "spousal incompetency" provision, carried forward apparently from 1965 Maryland Laws, Chapter 835.[4] None of the modifications to the subtitle since the 1973 recodification have changed any of the provisions relevant to the issues before us in the case at bar. As combined, the relevant statutory provisions in respect to spouses now state: "Unless otherwise provided ... [l]itigants and their spouses are competent and compellable to give evidence," section 9–101, "[o]ne spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage," section 9–105, and "[t]he

---

4. Interestingly, when the 1973 Act incorporated the privilege against the forced disclosure of confidential marital communications, it titled that section "9–105 Spouse-*Civil* Proceedings." (Emphasis added.) The codifiers, however, apparently modified the title to read "9–105. Testimony by spouses—Confidential communications occurring during marriage." Neither party in the case *sub judice* argues that the provision limiting the disclosure applies only in civil cases.

spouse of a person on trial for a crime may not be compelled to testify as an adverse witness...." § 9–106.

One of the issues to be resolved is just what, given the historical antecedents of the current statute, has been created by the Legislature? Is it "spousal incompetency" or "spousal privilege," or both, depending upon the context of the testimonial activity of the spouses? We have never, heretofore, directly addressed the issue. The positions of the other jurisdictions are mixed (sometimes within the same jurisdiction). I mention first those jurisdictions that have held either that the entire range of spousal testimony is a competency issue or that there is a general "spousal incompetency" issue (whether waivable or non-waivable) and, as to confidential marital communications, a "spousal privilege" issue.

The Supreme Judicial Court of Massachusetts in *Gallagher v. Goldstein*, 402 Mass. 457, 524 N.E.2d 53 (1988), was addressing a medical malpractice issue in which the patient allegedly had been rendered mentally incompetent as a result of the negligent actions of the defendants. The plaintiff's attorney sought to present testimony from the patient's husband as to conversations with the patient prior to her mental deterioration. The Massachusetts statute, in relevant part, then provided that a person of "sufficient understanding" could testify in court proceedings, except that "neither husband nor wife shall testify as to private conversations with the other." *Id.* at 459, 524 N.E.2d at 54. This language is similar to Maryland's section 9–105. This normally is considered to be the "communications privilege." The Massachusetts court held otherwise:

> The rule established by the statute is one of disqualification rather than privilege.... Testimony as to the contents of a private conversation is inadmissible even if both spouses desire the evidence to be admitted.
>
> ....
>
> It seems imprudent to prohibit testimony as to a marital conversation when both parties to the conversation want disclosure.... However, the Legislature has enacted a

statute stating a clear and unambiguous preference for the marital disqualification. We have consistently ruled that the statute renders spouses incompetent to testify as to the contents of their private conversations with their marital partners.... While we agree with the plaintiff that many of the stated policy reasons for this statute are anachronistic and that those that are not outmoded, such as the preservation of marital confidentiality and harmony, are not furthered by the inadmissibility of this testimony, we must construe the statute as it is written. Were this strictly a common law rule, we would not hesitate to transform it from a rule of disqualification to one of privilege. However, given the existence of the statute, that decision is for the Legislature.

*Id.* at 459–61, 524 N.E.2d at 54–55 (citations omitted) (footnotes omitted). *But see Commonwealth v. Maillet,* 400 Mass. 572, 575–78, 511 N.E.2d 529, 531–33 (1987) (referring, a year earlier, to the incompetency provisions as a "privilege," although the nature of the testimonial rule was not at issue).

The Supreme Court of Ohio in *State v. Adamson,* 72 Ohio St.3d 431, 650 N.E.2d 875 (1995), construed a provision similar to Maryland's section 9–106. Ohio Rule of Evidence 601(B), in relevant part, stated:

"Every person is competent to be a witness, except:

. . . .

"(B) A spouse testifying against the other spouse charged with a crime except when . . . :

. . . .

"(2) The testifying spouse elects to testify."

*Id.* at 433, 650 N.E.2d at 877. The court compared the spousal "competency" rule with the statute concerning the marital communications privilege:

The focus of Evid. R. 601(B) is the competency of the testifying spouse; in contrast, R.C. 2945.42 focuses on the privileged nature of spousal communications[.]

. . . .

Spousal privilege and spousal competency are distinct legal concepts which interrelate and provide two different levels of protection for communications between spouses. Under R.C. 2945.42, an accused may prevent a spouse from testifying about private acts or communications. However, even when the privilege does not apply because another person witnessed the acts or communications, a spouse still is not *competent* to testify about those acts or communications unless she specifically elects to testify. While the presence of a witness strips away the protection of the privilege, the protection provided pursuant to Evid. R. 601 remains.

. . . While Evid. R. 601 was amended in 1991 to allow the spouse the decision as to whether to testify against the accused spouse (the decision formerly lay with the accused), the rule still contains important protections for the accused, since it deals with the competency of persons testifying against him.

The rule requires that the testifying spouse *elect* to testify against her spouse. . . . Thus, under Evid. R. 601(B), a spouse remains incompetent to testify until she makes a deliberate choice to testify, with knowledge of her right to refuse.

*Id.* at 433–34, 650 N.E.2d at 877. *State v. Savage,* 30 Ohio St.3d 1, 506 N.E.2d 196 (1987), applied a prior version of the Ohio competency rule in which the decision of whether a spouse could testify rested with the accused. The Court distinguished the rule from a rule of privilege:

[S]pousal incompetency received different treatment, not based upon privilege, but upon a rule of absolute incompetency which could not be waived by failure of the defendant-spouse to object. Only when the defendant called his spouse to the stand . . . was the testifying spouse's incompetency waived, and cross-examination allowed.

. . . Furthermore, there are significant differences between a rule granting a particular privilege and one which defines a class of witnesses as incompetent. . . . [A] rule of

incompetency defines which *witness* may not offer testimony and then sets forth limited exceptions for when witnesses may be heard. [Citations omitted.]

*Id.* at 4, 506 N.E.2d at 198. *See also State v. Phelps,* 100 Ohio App.3d 187, 192, 652 N.E.2d 1032, 1035 (1995) ("Having demonstrated the uniqueness of the two rules, it becomes apparent that spousal incompetency is not subsumed within spousal privilege." (quotation omitted)).

It appears that at least the intermediate appellate court in Minnesota is in agreement with the holdings of the Ohio courts. In *State v. Thompson,* 413 N.W.2d 889 (Minn.Ct.App. 1987), the state took an appeal from an order suppressing a statement made to the police by the defendant's wife in respect to a communication between she and her husband. At the time of the communication of the statement, the parties had not been married, but were married at the time of trial. The defendant asserted that "the marital privilege would prevent it from being admitted in his trial." *Id.* at 890.

The Minnesota statute provided that "[a] husband cannot be examined for or against his wife without her consent, [or vice-versa], . . . nor can either, during the marriage or afterwards, . . . be examined as to any communication made by one to the other during the marriage." *Id.* at 890–91 (quoting Minn.Stat. § 595.02, subd. 1(a), (1986)). The appellate court opined, in part: "The marital privilege statute is twofold, providing for both the incompetency of the spouse and the privilege for marital communications." *Id.* at 891. Because the parties were not married at the time of the communication at issue, the court held that the "privilege" for marital communications was not involved, and affirmed the lower court's finding.

The South Dakota Supreme Court in *Jaques,* 256 N.W.2d at 560, was concerned with "whether or not a defendant in a criminal prosecution . . . can effectively silence the state's star witness . . . by marrying her before trial. . . ." The court held:

The state concedes that she cannot be called as a witness without her husband's consent. We hold that her previous testimony is likewise inadmissable, and reverse.

. . . .

. . . There can be no question but what the testimony of the witness being the spouse of the defendant [by the time of trial] was not competent unless he waived his privilege against her testifying.

*Id.* at 560, 563.

In *Burlington Northern Railroad v. Hood,* 802 P.2d 458, 465 (Colo.1990), the statute stated "[a] husband shall not be examined for or against his wife without her consent, [and vice-versa], and that 'during the marriage or afterward' neither spouse shall 'be examined without the consent of the other as to any communications made by one to the other during the marriage.'" (quoting Colo.Rev.Stat. 13–99–107(1)(a)(I), 6A (1990) (first alteration in original)). The Colorado Supreme Court held:

This statute creates two distinct privileges with respect to spousal testimony. The first privilege is sometimes referred to as the rule of spousal disqualification and prohibits one spouse from testifying against the other without the other's consent. The second privilege prohibits the disclosure of a spousal communication made by one spouse to the other during the marriage.

*Id.* at 465 (citations omitted). *See also Fisher v. State,* 690 So.2d 268, 272 (Miss.1996), ("We . . . note the difference between the marital privilege and spousal incompetency. Rule 601(a)(2) abolishes spousal incompetence to testify. . . . The non-offender spouse may be called to testify, but the other spouse may still invoke the privilege regarding confidential communications. . . .").

The existing Pennsylvania statute, like Maryland's section 9–105, uses the term "competent" in its treatment of the confidential marital communications privilege: "in a criminal proceeding neither husband nor wife shall be *competent* or permitted to testify to confidential communications made by

one to the other, *unless this privilege is waived* upon the trial." 42 Pa. Cons.Stat. Ann. § 5914 (West 1982) (emphasis added).

Pennsylvania also has a statute relating to a spouse's testimony while married to a criminal defendant that was once a rule of incompetency. The terminology used was changed to a "privilege" by an Act of 1989. *See Commonwealth v. Savage,* 695 A.2d 820, 823 (Pa.Super.1997) ( "The statutory provision dealing with spouses as witnesses against each other ... was rewritten by Act 16 of 1989. When that section was rewritten, it was changed 'from a rule rendering one spouse incompetent to testify against the other to a rule recognizing a privilege not to testify against one's spouse.' " (quoting *Commonwealth v. Newman,* 534 Pa. 424, 427, 633 A.2d 1069, 1070 (1993))). No such change in Maryland Code, section 9–106 of the Courts & Judicial Proceedings Article has occurred.

The new Pennsylvania testimonial statute was at issue in *Newman,* 534 Pa. 424, 633 A.2d 1069, a contempt case. The question presented there was whether the statute, effective after the date of the testifying spouse's acquisition of knowledge about the crime but before the defendant's trial, was applicable to compel her testimony against her husband. The court opined:

It has always been permissible for the Commonwealth to use information obtained from one spouse to build a case against the other spouse. The competency rule, now privilege, is a testimonial one....

. . . .

To paraphrase the rules with regard to spousal testimony, a husband or wife is now deemed competent to testify against his or her spouse, but has a privilege to refuse to give adverse testimony, which he or she may waive.... Even if a husband or wife may be called to give testimony adverse to his or her spouse, however, he or she is not competent to testify to confidential communications.

*Id.* at 429, 431–32, 633 A.2d at 1071, 1072.

Early in the evolution of the competency/privilege statute in Pennsylvania, prior to the Act of 1989, there were Pennsylva-

nia cases holding that it was a strict "spousal incompetency" rule, where the issue of competency could not be waived. In *Commonwealth v. Moore,* 453 Pa. 302, 305 n. 4, 309 A.2d 569, 570 n. 4 (1973), the statute then in effect provided that "[n]or shall husband and wife be competent or permitted to testify against each other...." In *Moore,* the court, commenting in a footnote, stated: "This is a competency statute to be distinguished in purpose and effect from the rules governing privileges or confidential communications." *Id.* at 306 n. 4, 309 A.2d at 570 n. 4. The Supreme Court of Pennsylvania held, in ruling that the prosecution should not have been permitted to comment to the jury on the defendant's failure to call his wife to testify in his defense, that:

> It is clear the purpose of the statute is to bar, either husband or wife, from testifying against the other, and this is a rule which is not waivable by the parties.... The statute by its very terms stops either spouse from adversely affecting a criminal case against the other; although it does allow a spouse to testify on behalf of the other....

*Id.* at 307, 309 A.2d at 571. It appears that the Pennsylvania courts have interpreted the 1989 change in their statute as modifying the rule of "spousal incompetency" into a rule of "spousal privilege" separate from the confidential marital communications provision, which expresses a "privilege" that can be "waived."

In *State v. Hurley,* 876 S.W.2d 57 (Tenn.1993), *cert. denied,* 513 U.S. 933, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994), the Supreme Court of Tennessee described a spouse's right to refuse to testify as "a privilege." The Tennessee Legislature apparently had abolished the statutory right of a spouse not to testify, but intended to retain the judicially created common-law "spousal incompetency" rule leaving the latter issue to the courts that had created it. The court said:

> [Tenn. R. Evid. 501] sets out that except as otherwise provided by constitution, statute, common law, ... no person has a privilege to:
>
> (1) Refuse to be a witness;

(2) Refuse to disclose any matter;

. . . .

... In pertinent part, the statute provides that a husband and wife shall be competent witnesses ... though neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation.

*Id.* at 61.

The court noted that even prior to the change in the statutes, the Tennessee Rules of Evidence provided that witness-spouses could be compelled to testify against defendant-spouses in criminal cases.

Prior to the adoption of the Rules of Evidence, T.C.A. § 40–17–104 provided that in all criminal cases, the husband or the wife were competent witnesses to testify for or against each other.... Over the years ... the cases have held that the statute did not abrogate the rule as to privileged, or confidential communications between husband and wife. Generally they have held that neither husband nor wife are permitted, over objection, to testify, in criminal cases, as to any matter occurring between them by virtue or in consequence of the marital relation, nor as to any confidential communications between them.... In view of this it becomes apparent that, at the time of the defendant's trial, there was not any constitutional or statutory provision in reference to spousal testimony in criminal cases, leaving us to look to the common law of this State for guidance. A study of the early decisions leaves no other conclusion than that, in company with many of our sister states, Tennessee courts adopted, in criminal cases, a hybrid combination of the ancient common law rule barring interspousal testimony on one hand, and the marital privilege in civil cases, established by statute, on the other.

*Id.* at 61–62.

After a discussion of Tennessee's statutory history in respect to a spouse's competency to testify and in respect to

confidential marital communications between spouses, the court concluded:

> After the enactment of the foregoing legislation, not withstanding that there was neither a statutory nor common law precedent for such decisions, the cases involving criminal proceedings in this State consistently have referred to the rule found in *Goodwin v. Nicklin and wife*, 53 Tenn. 256, 6 Heiskell (1871), a civil case in which the Court said: "The common law places the rejection of such evidence upon the high grounds of public policy, and because greater mischief and inconvenience would result from the reception than the exclusion of such evidence. On this account it is a general rule that the husband and wife cannot give evidence to affect each other either *civilly* or *criminally;* for to admit such evidence would occasion *domestic dissensions* and discord...."

*Id.* at 62.

The Tennessee court then discussed subsequent cases in which the testimonial issue was couched in terms of competency. It then noted that the common law rule as to spousal testimony had been created by the courts, and that, given that the new statute was made subject to the common law, the courts could still change the common law.

> The present rule is an anachronism, perhaps suitable for the times in which it was created, but no longer a viable guideline for the conduct of criminal proceedings in a world which has experienced so much change. We consider it timely to establish a policy which is better adapted to the circumstances marked by today's standards.

*Id.* at 63. The court then modified the common law to provide that the testifying spouse alone had a privilege not to testify and that a willing spouse could testify. *Id.* at 64; *accord State v. Bragan*, 920 S.W.2d 227, 240–41 (Tenn.Crim.App.1995).

In *State v. Holmes*, 330 N.C. 826, 829, 412 S.E.2d 660, 661 (1992), the Supreme Court of North Carolina noted: "At common law, the general rule regarding spousal testimony was that neither spouse could testify for or against the other

in either a civil or criminal proceeding. The spousal incompetency rule was later relaxed to provide that a spouse was competent to testify in favor of the other spouse and be subject to cross-examination. This modification . . . gave rise to a rule against adverse spousal testimony." (Citations omitted). The North Carolina Supreme Court had abrogated the common law rule of spousal incompetency and the North Carolina Legislature had enacted a law, much more extensive than Maryland's, that retained the competency-compellability language, but referred to the lack of compellability as a "privilege." The North Carolina Supreme Court has since referred to spousal incompetency in terms of "privilege," although acknowledging: "While our cases and statutes have not been models of clarity, collectively they stand for the proposition that a confidential communication between husband and wife is privileged and that this privilege, even in criminal cases, survives both the North Carolina Rules of Evidence and the amendments to [the relevant statute]." *Id.* at 833, 412 S.E.2d at 664.

Wyoming has also mixed the two concepts by referring to both as privileges, although, in a case involving the interpretation of the Wyoming statute, the Wyoming Supreme Court clearly distinguished them:

> Clarity and consistency demand that we distinguish between the confidential marital communication privilege and the privilege of spousal immunity. The privilege of spousal immunity may be invoked by the spouse who does not wish to be the instrumentality of condemnation directed at his or her partner. The confidential marital communication privilege is the privilege that ensures that private marital communications will remain private.
>
> . . . .
>
> The confidential marital communication privilege initially belongs to the spouse who communicates the confidential information. The spouse against whom the testimony is offered has the right to invoke the confidential marital communication privilege.

If the party spouse refuses to waive the confidential marital communication privilege, the witness spouse cannot testify [as to the confidential communication] even if he or she waives the spousal immunity privilege....

....

... We also hold that once the party spouse has waived the confidential marital communication privilege, the non-party spouse may then elect to invoke or waive the privilege of spousal immunity.

*Curran v. Pasek,* 886 P.2d 272, 275, 277 (Wyo.1994) (citations omitted). It is clear that in Wyoming, even though the Court refers to both concepts as "privileges," the concepts nonetheless retain their separate identities as a "spousal immunity," i.e., incompetency, provision and a "communications privilege."

The West Virginia Supreme Court of Appeals similarly refers to both concepts as privileges, while maintaining the distinction. In *State v. Bradshaw,* 193 W.Va. 519, 537–38, 457 S.E.2d 456, 474–75, *cert. denied,* 516 U.S. 872, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995), the Court noted: "There can be no question that W. Va.Code, 57–3–3, absolutely prohibits the spouse of a defendant from testifying against the defendant.... Where properly invoked, this statute precludes all adverse testimony by a spouse, not merely disclosure of confidential communications." (Footnote omitted.)

An argument can be sustained that in some jurisdictions both concepts are true "privilege concepts," although even in some of those jurisdictions a distinction is made between the concepts in spite of general descriptions referring to both as "privileges." In the federal courts, the seminal case is *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), in which a wife chose to testify against her husband under a grant of immunity. Certiorari was granted by the United States Supreme Court "to consider whether an accused may invoke the privilege against adverse spousal testimony so as to exclude the voluntary testimony of his wife." *Id.* at 41–42, 100 S.Ct. at 908. At trial she was not permitted to testify as to confidential marital communications, but she was permit-

ted to testify generally against her spouse, over his objection. Thus, the concept involved was clearly what is most often termed, generally, as a "spousal incompetency" issue. After discussing the "ancient rule" relating to the incompetency of a wife to testify against her husband because they were, in the eyes of the law, a single person, the Court noted that the "rule of spousal disqualification remained intact in most common-law jurisdictions well into the 19th century." *Id.* at 44, 100 S.Ct. at 909. The Supreme Court then stated:

> Indeed, it was not until 1933, in *Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 [ (1933) ], that this Court abolished the testimonial disqualification in the federal courts, so as to permit the spouse of a defendant to testify *in the defendant's behalf. Funk,* however, left undisturbed the rule that either spouse could prevent the other from giving adverse testimony. The rule thus evolved into one of privilege rather than one of absolute disqualification. [Emphasis added].

The Court later commented:

> It is essential to remember that the *Hawkins* [5] privilege is not needed to protect information privately disclosed between husband and wife in the confidence of the marital relationship. . . . Those confidences are privileged under the independent rule protecting confidential marital communication.

*Id.* at 50–51, 100 S.Ct. at 912–13 (citations omitted). *Trammel,* although speaking of the abolishment of the "spousal disqualification," and defining it as a "privilege," really, in the end only modified, which spouse had the power to waive it. *See id.* at 53, 100 S.Ct. at 914.

*Trammel* led the way for some of the federal circuits to define "spousal incompetency" issues as "privileges." In a case involving allegations of drug smuggling, the United States Court of Appeals for the Fifth Circuit noted in *United*

---

5. *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958).

*States v. Ramirez,* 145 F.3d 345, 355 (5th Cir.), *cert. denied,* 525 U.S. 1046, 119 S.Ct. 602, 142 L.Ed.2d 543 (1998), that: "The marital privilege is divided into two distinct privileges by the federal courts. The first privilege bars a spouse from testifying adversely to the other. The second privilege bars a spouse from testifying as to the confidential marital communications of the other." *See also United States v. Rakes,* 136 F.3d 1, 3 n. 2 (1st Cir.1998); *United States v. Bahe,* 128 F.3d 1440, 1441–42 (10th Cir.1997), *cert. denied,* 523 U.S. 1033, 118 S.Ct. 1327, 140 L.Ed.2d 489 (1998).

Several state jurisdictions appear to utilize the same reasoning, terminology and definitions used in *Trammel. See Holyfield v. State,* 365 So.2d 108, 110 (Ala.Crim.App.1978) ( "At common law the spouse of a party ... was incompetent to testify for or against his or her mate. The majority of jurisdictions ... however, have altered this rule and have made a spouse a competent witness.... Nonetheless, he or she still has the privilege not to testify if he or she so elects."); *State v. Peters,* 213 Ga.App. 352, 354–55, 444 S.E.2d 609, 611 (1994) ("Under Acts 1866, ... which essentially incorporated the common-law rule, spouses were neither competent nor compellable to testify.... Finally subsection (b) was added in 1987, providing that the *privilege* shall not apply where the husband or wife is charged with a crime against ... a minor child." (emphasis added)); *see also Pirkle v. State,* 234 Ga. App. 23, 23–24, 506 S.E.2d 186, 187–88 (1998). Although Texas considers both "spousal incompetency" and confidential marital communications to be questions of privilege, it still maintains the distinction between the two. *Cf. Poole v. State,* 910 S.W.2d 93, 95 n. 6 (Tex.App.1995) ("TEX. R. CRIM. EVID. 504(2) merely protects an accused's spouse from being called as a witness for the State."); *Tejeda v. State,* 905 S.W.2d 313, 316 (Tex.App.1995, pet.ref'd) ("The spouse of an accused has a privilege not to be called as a witness for the State....").

Although clearly speaking of what under the common law was referred to as "spousal incompetency," Arizona has expressly termed it by statute to be a privilege, titling it as the

"Anti–Marital Fact Privilege." *See State ex rel. Woods v. Cohen*, 173 Ariz. 497, 501–02, 844 P.2d 1147, 1151–52 (Ariz. 1992) ("A person shall not be examined as a witness in the following cases: 1. A husband for or against his wife without her consent, [and vice-versa], as to events occurring during the marriage." (quoting Ariz.Rev.Stat. § 13–4062(1))); *see also* 8 Wigmore, *supra*, § 2335, at 546. Arizona, like Maryland, codifies its marital communications protection in a separate statute. The Arizona statute expressly titles that protection as "Husband and wife; privileged communications." Ariz. Rev.Stat. Ann. § 12–2232 (West 1994).

The Court of Appeals of Washington, while referring to it as a "marital privilege," nonetheless maintained the distinction between the two concepts in *State v. Modest*, 88 Wash.App. 239, 246–47, 944 P.2d 417, 421 (1997), *rev. denied*, 134 Wash.2d 1017, 958 P.2d 317 (1998):

> The marital privilege is contained in RCW 5.60.060(1), which provides that neither a husband nor a wife can testify for or against the other spouse without the spouse's consent. Because Ms. Modest was not married to Mr. Modest at the time of trial, this provision does not preclude her testimony. Even a former spouse, however, cannot be examined regarding any confidential communication made by one to the other during the marriage. [Citation omitted.] [Footnote omitted.]

That court also said in *State v. Denison*, 78 Wash.App. 566, 574, 897 P.2d 437, 441, *rev. denied*, 128 Wash.2d 1006, 907 P.2d 297 (1995):

> The privilege ... consists of two parts. The first applies to an existing marriage; it prevents testimony by a spouse, without the consent of the nontestifying spouse, as to events before or during marriage. The second applies either during or after a marriage; a spouse, without the consent of the other, cannot be examined as to confidential communications made during the marriage.

*See also Shepherd v. State*, 257 Ind. 229, 231, 277 N.E.2d 165, 166 (1971) ("Although the statute refers to husbands and wives

as being incompetent witnesses, as to communications made to each other, the matter is actually one of privileged communication." (citation omitted)); *State v. Benner,* 284 A.2d 91, 107 (Me.1971) ("[E]ven though the 1969 exception for 'marital communications' was created in the context of witness *competency,* the Legislature was intending to specify a *privilege* . . . .").

### Section 9–106 codifies the common law concept of "spousal incompetency."

Petitioner argues that section 9–106 is not a competency section. Instead, he argues, section 9–106 is a "compellability section." [6] He states: "Beginning with section 9–106, subtitle 1[ ] addresses compellability and privilege." I believe that is incorrect. Section 9–106, by its use of the word "Same—" in its title, relates to the spousal testimony provisions of the previous section, 9–105. As these statutes have been codified in the subtitle, the word "privilege" is first mentioned in section 9–107 ("Defendant in a criminal trial.").

The juxtaposition of sections 9–105 and 9–106 reinforces my belief that they are intended and designed for a different purpose than that suggested by petitioner. Section 9–106 governs whether a spouse, against that spouse's wishes, may be compelled to testify at all during the marriage. It is a classic "spousal incompetency" issue. At the time this provision was added to the Maryland statutes by 1965 Maryland Laws, Chapter 835, there had been no statutory "spousal incompetency" rule in Maryland for over seventy-five years. During that entire period, there had been in existence only statutory protection for confidential marital communications. At the time, therefore, that the "spousal incompetency" rule was last made a part of statutory spousal testimonial protections in Maryland, it was totally unrelated to any need to protect confidential marital communications. That already

---

**6.** In the context of the issue presented only competent witnesses are "compellable." It may well be that compellability is an indication of competence, at least in a general sense. The two terms appear throughout the cases to be used in almost identical ways.

existed. In all probability, although we cannot be sure because of the non-existence of bill files, the location of this latter testimonial protection in section 9–106 is due to the fact that it was added to the previous protection against compelled disclosure of confidential marital communications provision. 1964 Maryland Laws, Chapter 835 inserted the "spousal incompetency" provision immediately after the already extant confidential marital communications provision, and it read, "nor shall the husband or wife be compelled to testify as an adverse party or witness in any criminal proceeding involving his or her spouse." In other words, in the re-codifications of the statute, the provisions contained in section 9–106, in all likelihood, follow the provisions contained in section 9–105 because that is the sequence in which they were last enacted and the sequence in which they were found in Maryland Code (1957), Article 35, section 4, prior to the recodification of these provisions in the Courts & Judicial Proceedings Article.

Considering the legislative history, the common law antecedents we have discussed, and the cases of this and other jurisdictions we have reviewed, I would hold that Section 9–106 of the Courts & Judicial Proceedings Article is a "spousal incompetency," "spousal disqualification" or "spousal immunity" rule. In other words, during the marriage itself, a spouse, with certain exceptions found in section 9–106, may not be forced to testify in a criminal case where the other spouse is a defendant. Given the language of the Maryland statute, a spouse who elects to testify may do so; however, even then, he or she may not, without the consent of the other, testify as to confidential marital communications.

### Section 9–105 establishes a privilege

As petitioner emphasizes to this Court, section 9–105 states that one spouse "is not competent" to testify regarding any marital communications. But for the continuing viability of the "spousal incompetency" concept by statute, the plain language of this statute might infer that section 9–105 is a statute based on competency. The history of the statutes, however, as I have indicated, is otherwise. The existence of section 9–

106 as a modified "spousal incompetency" provision reinforces, by contrast, my belief that section 9–105 relates to privilege.

The "competent" language has been in the legislative enactment of the marital communications privilege since its inception. *See* 1864 Md. Laws, Chap. 109, § 1 ("[N]or in any case ... shall any husband be competent or compellable to disclose any communication made to him by his wife during the marriage, nor shall any wife be compellable to disclose any communication made to her by her husband during the marriage."). A number of sources indicate that the marital communications privilege was never intended to be a matter of competency. By the passage of 1888 Maryland Laws, Chapter 515, the Legislature declared spouses to be competent, but created an exception for confidential communications. It used the words "in no case ... shall any husband or wife be competent to disclose any confidential communication made ... during the marriage." In essence, as I now perceive it, the Legislature at that point established competency that was limited by a privilege in spite of the use of the inaccurate term "competent." Next, it is important to again note the distinction between the marital communications privilege and the related spousal testimony disqualification, which is often mislabeled as a "marital privilege," but functions, I think, basically as a rule of competency. The disqualification, which, in Maryland, is, I believe, codified in section 9–106, generally prohibits a witness-spouse from being compelled to testify against his or her spouse about anything. In modern statutes, the disqualification may apply only in criminal matters and often contains exceptions for when the witness-spouse or a related child is the victim of the defendant-spouse's crime.

At common law, the disqualification was much broader. At first it was absolute and there were no exceptions; then later the defendant-spouse could invoke it. It was also a disqualification for a spouse who wished to testify favorably for his or her spouse. As Parliament and the legislatures of the various American states began to repeal or limit the effect of spousal disqualification statutes, many saw a continuing need to pro-

tect marital communications meant to be held in confidence. That is what I perceive the Legislature has done in this State.

Section 9–105, establishing the communications privilege is set apart from the spousal incompetency provisions found in section 9–106. Although the legislative history available to us, as I have said, is not complete, i.e., legislative history files prior to 1975 have not been maintained, the Legislature is presumed to be aware of the holdings of this Court, including *Coleman*, and of the common law in general. It is fair to assume, given the sequence of statutory enactments, that the General Assembly had always viewed the evidentiary protection of marital communications as a privilege. The word "competent," used in section 9–105, appears to be a throwback to the original statute, which combined the communications privilege and the spousal incompetency rule in one paragraph.

This interpretation of section 9–105 as establishing a privilege is further bolstered by this type of legislative treatment of the confidential marital communication provisions in other jurisdictions. Many of these foreign states label the protection of marital communications as a "privilege" in their statutes relating to court procedure.[7] Other jurisdictions grant a marital communications "privilege" in their rules of evidence.[8]

---

7. *See* Ariz.Rev.Stat. Ann. §§ 12–2232, 13–4062 (West 1999); Cal. Evid. Code § 980 (West 1995); Fla. Stat. Ann. § 90.504 (West 1999); Kan. Stat. Ann. § 60–428(a) (1995); La.Code Evid. Ann. art. 504(b) (1995); Neb.Rev.Stat. § 27–505 (1995); Nev.Rev.Stat. Ann. § 49.295 (Michie 1996); N.J. Stat. Ann. § 2A:84A–22 (West 1994); N.M. Stat. Ann. § 38–6–6 (Michie 1999); N.Y. C.P.L.R. Law § 4502(b) (Consol.1978); Ohio Rev.Code Ann. § 2317.02(D) (Anderson 1998); Okla. Stat. Ann. tit. 12, § 2504(B) (1993); Or.Rev.Stat. § 40.255(2) (1997); S.D. Codified Laws § 19–13–13 (Michie 1995); Tenn.Code Ann. § 24–1–201(b) (1999); Utah Code Ann. § 78–24–8 (1996); Wash. Rev.Code § 5.60.060 (1998); Wis. Stat. Ann. § 905.05(1) (West 1993); Wyo. Stat. Ann. § 1–12–101(a)(iii) (Michie 1999). The Virginia Code provides that spouses are competent to testify for or against one another in civil cases, but excepts privileged communications. Va.Code Ann. § 8.01–398 (Michie 1992). The criminal statute provides that in certain cases a spouse is competent to testify "except as to privileged communications." *Id.* § 19.2–271.2 (1999).

8. *See* Ala. R. Evid. 504(b); Alaska R. Evid. 505(b); Ark. R. Evid. 504(b); Del. Unif. R. Evid. 504(b); Haw. R. Evid. 505(b)(2); Ky. R. Evid.

The federal courts also recognize a common-law marital communications privilege. *See Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *see also State v. Littlejohn*, 199 Conn. 631, 649–50, 508 A.2d 1376, 1385–86 (1986) (recognizing a common-law marital communications privilege in Connecticut).

Having concluded that section 9–105 establishes a privilege, albeit for somewhat different reasons, I further agree, for the reasons stated in the majority opinion, that petitioner did not waive his privilege in the case *sub judice*.

504(b); Me. R. Evid. 504(b); Miss. R. Evid. 504(b); N.H. R. Evid. 504; N.D. R. Evid. 504(b); Tex.R. Evid. 504(a)(2); Vt. R. Evid. 504(b). Uniform Rule of Evidence 504(a) also states that "[a]n individual has a privilege to refuse to testify or to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage."