Dear Mr. Alfred W. Redmer, Jr.
You have asked for our interpretation of a recently-enacted law that establishes a formula for a State subsidy of physician malpractice insurance premiums over a four-year period. In particular, you ask whether a subsidy should be paid if an insurer decides not to alter its premium rate for 2006.
The statutory language that defines the subsidy formula, if applied literally, would result in no subsidy being paid in 2006 if an insurer's premium rate does not change; by contrast, it could result in a very substantial subsidy in a subsequent year if even a small rate increase became effective. This appears to be attributable to an oversight in the drafting of the statute. The statute as a whole demonstrates a legislative intent to subsidize physician malpractice premiums for a limited period at a gradually declining rate. The legislative history confirms that intent. Accordingly, it is our opinion that you should disregard the portion of the statute that reflects the drafting oversight and apply the subsidy formula to achieve the legislative purpose even if an insurer does not alter its premium rate for 2006.
 I Background
A. Emergency Legislation at 2004 Special Session
During its special session in late 2004 and early 2005, the General Assembly passed emergency legislation entitled the Maryland Patients' Access to Quality Health Care Act of 2004. Chapter 5, Laws of Maryland 2004 (Special Session).[1] That law was designed to respond to a dramatic increase in medical malpractice insurance premiums in 2003 and 2004.[2] To reduce malpractice claims and liability in the long run, the law made a number of changes in tort law and in laws regulating physician discipline, insurers, tort claims, and patient safety, among others. To limit the increase in malpractice insurance premiums in the short run, it created the Maryland Medical Professional Liability Insurance Rate Stabilization Fund which would support a reinsurance mechanism to cap premiums.
B. Creation of New Subsidy Mechanism at 2005 Session
Shortly after it enacted the emergency legislation and before the new fund had collected or paid out any money, the Legislature convened in its 2005 regular session and enacted legislation to change the mechanism for limiting malpractice insurance premiums. Chapter 1, Laws of Maryland 2005. That law repealed the provisions establishing a special fund and reinsurance mechanism. In its place, it created the Maryland Health Care Provider Rate Stabilization Fund ("Fund") and set forth a method for using moneys from the Fund to directly subsidize malpractice insurance premiums of physicians and nurse midwives. Those provisions were codified at Annotated Code of Maryland, Insurance Article ("IN"), § 19-801
et seq. As with the emergency legislation, one of the key purposes of the law was "to retain health care providers in [Maryland] by allowing [malpractice insurers] to collect rates that are less than the [approved rates]." IN § 19-802(b)(1).[3]
1. Maryland Health Care Provider Rate Stabilization Fund
The Fund consists primarily of revenue generated by a premium tax imposed on health maintenance organizations (HMOs) and managed care organizations (MCOs). IN §§ 6-102, 19-802(c). The Fund is a special, non-lapsing fund that is not subject to the requirement that unspent balances revert to the General Fund. IN § 19-802(d).
Moneys in the Fund are to be devoted to several purposes: subsidizing malpractice insurance premiums for physicians and nurse midwives for several years; increasing fee-for-service rates paid to providers by the Medicaid program, as well as payments to MCOs that serve that program; paying for the administration of the Fund by the Insurance Commissioner during the years that malpractice insurance premiums are subsidized. IN § 19-802(b).
The Fund is essentially divided into three subfunds. The pertinent subfund, for purposes of this opinion, is known as the Rate Stabilization Account ("RS Account"). IN § 19-802(g)(1).[4] Funds in this account are to be used to subsidize malpractice insurance premiums. The statute allocates a declining portion of the Fund to the RS Account over a period of four years to pay for subsidies during 2005 through 2008. IN § 19-803(b)(3).[5] The disbursements from the RS Account are to be used only to pay the subsidy as determined by the statutory formula. IN § 19-804(b), (c)(2). Funds that are allocated to the RS Account in one of those years, but not spent on subsidies, remain in the account for subsequent years until the subsidy ends in 2009.[6] IN § 19-804(c). If there are insufficient funds in the RS Account to pay the full amount of the subsidy under the statutory formula, the subsidy is to be reduced pro rata. IN § 19-804(d). If a new insurer enters the State to sell malpractice insurance policies, the Commissioner may reserve up to 5% of the RS Account to provide subsidies for its policyholders.[7] IN § 19-803(d).
2. Subsidy Mechanism
The statute does not require an insurer or its insureds to participate in the subsidy program; rather, participation is voluntary. IN § 19-805(a). If an insurer decides to participate and seek reimbursement from the Fund, it must annually provide each of its policyholders with an estimate of the policyholder's subsidy and give the policyholder an opportunity to opt out of the benefit. Id.[8]
To obtain reimbursement from the RS Account on behalf of its policyholders, an insurer must apply to the Insurance Commissioner, who is charged with administration of the Fund, according to procedures that the Commissioner adopts. IN § 19-805(e). The insurer must provide the Commissioner with information concerning the number of policyholders, their classifications, the approved premium rate with respect to those policyholders, the actual premiums charged by the insurer, and the total reimbursement sought, among other things. Id. That information is subject to an annual audit by the Commissioner. IN § 19-805(i).
The Commissioner is to disburse funds from the RS Account to insurers on a quarterly basis. IN § 19-805(f).[9] Those amounts are to be used by the insurer to reduce rates, provide a credit, or issue a refund, to a policyholder depending on the particular circumstances of the policyholder. IN § 19-805(g).
3. Formula for Premium Subsidy
The amount of the subsidy paid each year is determined by a formula. The statute defines the formula for the subsidy as follows:
 ... the subsidy provided to each policyholder shall:
 (1) For medical professional liability insurance policies subject to rates that were approved for an initial effective date on or after January 1, 2005, but prior to January 1, 2006, the amount of a premium increase that is greater than 5% of the approved rates in effect 1 year prior to the effective date of the policy; and
 (2) For medical professional liability insurance policies subject to rates that were approved for an initial effective date on or after January 1, 2006, a percentage of the policyholder's premium for the prior year that equals the quotient, measured as a percentage of the balance of the rate stabilization account for the current calendar year divided by the aggregate amount of premiums for medical professional liability insurance that would have been paid by health care providers at the approved rate during the prior calendar year.
IN § 19-805(b).[10] The subsidy described for the years 2006 through 2008 is also referred to as the "subsidy factor." See also IN § 19-801(g) (defining "subsidy factor" in language identical to IN § 19-805(b)(2)).
The Commissioner is to determine the subsidy factor by November 1 each year and notify insurers by December 1 of that figure.[11] IN § 19-806(a), (b)(1).
 II Analysis
In your request for this opinion you asked that we assume that an insurer sought and obtained a premium rate increase that first became effective during 2005 and that eligible policyholders who had malpractice policies with this insurer received subsidies from the RS Account for 2005 pursuant to IN § 19-805(b)(1). You also ask us to assume that the same insurer has elected not to alter its premium rates for 2006, but rather to continue its 2005 rates. You ask whether the eligible policyholders insured by this company would be entitled to a subsidy of their 2006 premiums from the RS Account.
A. Literal Application of Statute
1. Hypothetical Situation — No Rate Increase in 2006
Under the facts you hypothesize, the insurer has an approved rate for 2005 that exceeds the insurer's premium rate for 2004. The approved rate necessarily had an initial effective date prior to January 1, 2006. Thus, the formula for the subsidy in 2005 would be determined by reference to IN § 19-805(b)(1). If the increase were greater than 5%, the insurer's policyholders would generally be entitled, under IN § 19-805(b)(1), to a subsidy equal to the difference between the amount of the actual increase and a 5% increase.[12] In other words, the subsidy would protect the policyholders from experiencing more than a 5% increase in their premiums for malpractice insurance.
You posit that the insurer does not seek an increase or new approved rate for 2006. In that case, there would be no subsidy under the literal language of IN § 19-805(b)(1). Under that provision, the subsidy equals "the amount of the premium increase that is greater than 5% of the approved rates in effect 1 year prior to the effective date of the policy." In the circumstances you have described, the premium rate for 2006 would be the same as the "approved rate in effect 1 year prior to the effective date of the policy." Thus, the 2006 premium would not exceed a 5% increase over the 2005 premium. There would be no subsidy under IN § 19-805(b)(1).
Nor would a subsidy be available under the formula in IN § 19-805(b)(2). That formula literally applies only in the case of a premium "approved for an initial effective date on or after January 1, 2006." The premium rate in question would have had an initial effective date in 2005. Thus, IN § 19-805(b)(2) simply would not apply.
2. Hypothetical Situation — Small Rate Increase in 2007
This application of the literal language of the subsidy formula, however, appears to be contrary to the evident purpose of the statute. A hypothetical example that incorporates the facts you have described is illustrative. Suppose malpractice insurers obtained approval of rate increases on the order of 20% for 2005. Under IN § 19-805(b)(1), a policyholder would experience only a 5% increase and the subsidy from the RS Account would cover the remaining 15%. Suppose the insurers chose not to seek approval of an increase premium for 2006. Under the literal language of the statute, as explained above, there would be no subsidy and the policyholders would experience the full brunt of the 20% increase in 2006. However, funds would accumulate in the RS Account for that year.
Suppose the insurers then obtained approval of a small increase for 2007. That rate increase would have an initial effective date after January 1, 2006 and the insurers would be entitled to a subsidy according to the formula in IN § 19-805(b)(2). Under that formula the subsidy is a percentage of the new premium that equals a fraction composed of the balance of the RS Account divided by the aggregate amount of premiums at the approved rate for the prior year. Accordingly, the larger the balance of the RS Account, the greater the percentage subsidy. Because the balance of the RS Account would consist of the allocations for both 2006 and 2007, there would be a very substantial subsidy for 2007. This subsidy would undoubtedly absorb the entire increase in the 2007 premium and likely reduce the amount paid by a policyholder well below the amount the policyholder paid in 2006. It is even conceivable that the large subsidy for 2007 would reduce the amount paid by policyholders below the amounts paid in 2005 and 2004.
The net effect of this strict application of the language of the statute would be that the subsidy would rise and fall like a yo-yo over this period with the premiums actually paid by policyholders rising and falling equally radically in the opposite direction.[13] It is difficult to believe that this is the solution that the Legislature intended to resolve the perceived crisis in malpractice insurance marketplace. Nor is this a pattern one would expect to find in a formula for a "rate stabilization subsidy."
B. Giving Effect to Legislative Purpose
1. Principles of Statutory Construction
The Court of Appeals has declared that, where a literal construction of statutory language would yield a result so inconsistent with the apparent legislative purpose as to demonstrate a drafting error, "the plain meaning rule is not rigid." Kaczorowski v. City of Baltimore, 309 Md. 505, 513, 525 A.2d 628 (1987). In that situation, if the legislative purpose can be determined from an examination of the statute's context and history, a non-literal construction that gives effect to that purpose is to be adopted, even if that construction varies from an unambiguous, but ill-drafted text. See, e.g., Kaczorowski, 309 Md. at 511-20 (holding that provision repealing authority for local industrial development authority should be disregarded); Brown v. State, 359 Md. 180, 753 A.2d 84 (2000) (construing statute that declared that one spouse "incompetent" to testify with respect to confidential communications with other spouse to create a testimonial privilege rather than a rule of witness competency); see also 85 Opinions of the Attorney General ___ (2000) [Opinion No. 00-011 (May 19, 2000)] (concluding that Election Law required State officials to make determinations concerning law passed by General Assembly despite language that literally assigned task to county attorney); 84 Opinions of the Attorney General 138 (1999) (concluding that Maryland Hospital Bond Program was available for bonds issued by the Maryland Industrial Development Financing Authority even though section could be read to restrict program to political subdivisions); 82 Opinions of the Attorney General 165 (1997) (concluding that retailers could continue to collect "bad check fee" notwithstanding the apparent repeal of legislation authorizing such fees).
2. Legislative History of Subsidy Formula
A literal interpretation of the subsidy formula appears inconsistent with the origin and stated purpose of the Fund. Many of the features in the 2004 and 2005 legislation can be traced to the report of a Senate commission that made various recommendations for legislation that would impact medical malpractice insurance rates. In particular, it recommended that a fund be created to provide "immediate relief" to physicians by allowing them to purchase liability insurance at a reduced cost through a rebate or insurance rate reduction. It was contemplated in the report that such a subsidy program would remain in effect for four years. Recommendations of the Senate Special Commission on Medical Malpractice Liability Insurance (December 2004) at pp. 7, 14.
The portion of the 2005 legislation that created the Fund was clearly designed to carry out those parts of the Commission's recommendations. The Legislature specified in the statute that one of its purposes was to retain health care providers in Maryland by allowing malpractice insurers "to collect rates that are less than the [approved] rates ..." IN § 19-802(b)(1). In addition, the statute allocates moneys to the RS Account — the part of the Fund that supports malpractice insurance subsidies — for a period of four years.
Under a literal reading of the subsidy formula, this intention would be defeated as a malpractice insurer would collect the approved rate in 2006, even though that rate represented a dramatic increase over the rates collected in the prior year and even though there would be substantial funds in the RS Account for the specific purpose of subsidizing those insurance premiums.
It is not totally inconceivable that a legislature might provide for the elimination of a monetary benefit followed by its sudden reappearance.[14] However, if such were the case here, one would expect a clear explication and understanding of this seemingly illogical approach in the legislative record. We find none. Instead, the legislative record suggests that the General Assembly contemplated that physicians would receive a significant subsidy for their malpractice insurance premiums for four years while the other reforms enacted during the 2004 Special Session and the 2005 Session took effect and lowered the anticipated liability and related premium rates.
The bill that created the Fund, as it was originally introduced, articulated the formula for calculating the subsidy in different terms from the language that was ultimately enacted. See Senate Bill 836 (2005) — first reader. In particular, under the original version of the bill, policyholders would pay a "stabilized rate" that would increase more gradually over a four-year period than the approved rate. The subsidy would make up the difference.
As originally proposed, the subsidy with respect to each policyholder would equal the difference between the premium charged by the insurer at the approved rate and the premium charged at the "stabilized rate." Id., Proposed IN § 19-805(b). The "stabilized rate" was defined essentially as the approved rate for the policyholder in effect for the prior year multiplied by an "increased rate factor." Proposed IN § 19-801(h). The "increased rate factor" was in turn defined as:
 (1) For medical professional liability insurance polices subject to rates that were approved for an initial effective date on or after January 1, 2005, but prior to January 1, 2006, 105% of the approved rates in effect 1 year prior to the effective date of the policy; and
 (2) For policies effective for the 3 years subsequent to the period set forth in paragraph (1) of this subsection, a percentage, as determined annually by the Commissioner, of the approved rates in effect 1 year prior to the effective date of the policy.
Proposed IN § 19-801(d). Thus, it appeared that the intent was to allow for an increase of 5% in the effective premium paid by physicians for 2005. For the years 2006 through 2008, the statute authorized the Commissioner to set the rate of subsidy. The Commissioner was to set the rate by reference to the amount allocated to the RS Account for the particular year, which was to be used solely for purposes of funding subsidies. Proposed IN § 19-806(a). It is evident from declining allocations to the RS Account in the statute for the period 2006 through 2008 that the Legislature expected that the amount of the subsidy would gradually decline.
However, the literal language of the formula set forth in Proposed IN § 19-801(d) did not achieve that result. While the "increased rate factor" was evidently intended to be a percentage figure, the number described in the definition was not actually a percentage and, literally applied, would have resulted in computations far afield from the apparent legislative intent.[15]
At the Senate hearing on the proposed bill, the Maryland Insurance Administration ("MIA") suggested that the language of the bill be amended in a number of respects. Among the items identified by MIA as worthy of amendment was the formula for the subsidy and related terms. It proposed that the term "subsidy factor" be substituted for "stabilized rate" as a more accurate characterization of the purpose of the computation. See MIA's Points of Clarification Regarding the Rate Stabilization Fund as Modified in SB 836/HB 1359 at p. 1. Consistent with that approach, MIA suggested that it would be confusing to suggest that insurers would be charging a rate different from the approved rate and that the statute should simply reflect that they would collect a reduced amount from policyholders in anticipation of the State subsidy. Id. The MIA also suggested that the formula for the subsidy be revised. Its written critique of the subsidy formula is somewhat confusing and susceptible of a number of interpretations, perhaps because, as the MIA witness testified at the hearing, it was put together on very short notice.[16] In any event, it does appear clear that the MIA believed that the Legislature intended to moderate increases from "the prior year's premium."
At the hearing on the bill, a representative of MIA characterized the formula in the bill as "awkwardly worded," but said that MIA representatives had been able to agree with legislative staff to work out substitute wording. The change was described as a "technical amendment." Testimony of Associate Commissioner Pamela Randi Johnson before Senate Finance Committee on Senate Bill 836 (February 23, 2005). There was no suggestion that MIA was proposing that the General Assembly deviate from the effort to provide a gradually diminishing subsidy to policyholders over the four-year period.
A new version of the subsidy formula was added to the bill by way of floor amendment in the Senate. In describing the significance of the amendment, the floor manager of the bill explained that it did not change the substance of the subsidy, but was recommended for technical reasons by MIA. She recommended adoption of the proposed amendment on the basis that the Insurance Commissioner was charged with administration of the subsidy program and that insurance industry representatives had also agreed to the amendment. Remarks of Senator Dolores Kelley concerning floor amendments to Senate Bill 836 (March 10, 2005).
Once again, however, the drafters had encountered some difficulty expressing the agreed-upon concepts in words. It was apparently easier to describe the subsidy to be provided in 2005 as opposed to subsequent years. Many of the key facts were already known for 2005 — e.g., the amount of the approved rate increase for 2005 and the likely proceeds from the new tax that would fund the subsidy for that year. There apparently was sufficient confidence in those estimates for there to be a common understanding that the RS Account could support a subsidy that allowed policy holders to experience only a 5% increase in their malpractice premiums. However, for future years, some of the critical variables were unknown. What premium would the insurers seek in the future? Would the MIA approve that rate? How much revenue would be collected to fund the subsidy? The challenge was to devise language that accurately described those variables in a formula that would give the Commissioner adequate direction as to the subsidy to be disbursed.
The amendment clearly defined the subsidy for 2005 as the amount of the approved rate in excess of 105% of the 2004 rate. For the years 2006 through 2008, the formula first computed the amount in the RS Account for the current year as a percentage of aggregate premiums at the approved rate for the prior year and would reduce the current year approved premium by that amount. That approach appeared to replicate the method used for the 2005 subsidy without committing to a specific percentage figure, in light of the unknown variables. However, in distinguishing the formula for 2005 from that for the subsequent years, the amended language appeared to assume that there would be a new approved rate for each year.[17]
Thus, the statute distinguishes the two parts of the formula by reference to the "initial effective date" of a premium rate.
However, the language would have incorporated a distinction between the two parts of the formula even if the word "initial" had been omitted. Moreover, if the word "initial" were omitted, the literal application of the statute, both in the circumstances you hypothesize and in the example we gave above, would result in a gradually diminishing subsidy for policyholders that the Legislature apparently intended. Neither the initial reinsurance mechanism in the 2004 emergency legislation, nor the original proposal for the subsidy formula in the 2005 legislation, required that an insurer obtain a new approved rate for 2006 or subsequent years in order for its policyholders to be eligible for the premium subsidy. None of the descriptions of the floor amendment suggested that any of the interested parties intended to place such a condition on eligibility for a subsidy.[18] In these circumstances, Kaczorowski and its progeny indicate that an interpretation of the statute that furthers the legislative purpose should be favored over a literal interpretation at odds with that purpose. Accordingly, in our opinion, you should not give effect to the use of the word "initial" in IN § 19-805(b)(2).
We recommend that the General Assembly revise the formula to confirm its intent as we have construed it. In addition, the Legislature may also wish to consider whether the formula should be revised in other respects.[19]
 III Conclusion
In our opinion, the literal language of IN § 19-805(b)(2) in the circumstances that you envision would yield a result inconsistent with the purpose of the statute. This appears to be attributable to an oversight in the drafting of the subsidy formula. The statute as a whole demonstrates a legislative intent to subsidize physician malpractice premiums for a limited period at a gradually declining rate. The legislative history confirms that intent. In accordance with the rules of statutory construction, you should disregard the one word that would defeat the legislative intent and apply the statute to achieve the legislative purpose.
In our opinion, this should be done by ignoring the use of the word "initial" in IN § 19-805(b)(2) and applying the formula in that paragraph to a rate effective after January 1, 2006, whether or not its initial effective date preceded that date. We also recommend that the General Assembly amend the statute to confirm this interpretation of its purpose.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] The bill was vetoed by the Governor on January 10, 2005, but the General Assembly overrode the veto the next day.
[2] A legislative report noted that the State's largest medical malpractice insurer had obtained approval of rate increases of 28% and 33% in those years for calendar years 2004 and 2005, respectively. See Recommendations of the Senate Special Commission on Medical Malpractice Liability Insurance (December 2004), pp. 1-2. The Governor's executive order convening the special session likewise alluded to the rising cost of malpractice premiums as part of a health care crisis to be addressed in the special session. See Executive Order 01.01.2004.70.
[3] The emergency legislation passed during the 2004 special session contained virtually identical language. See IN § 19-104.1(c)(1) as enacted in Chapter 1, Laws of Maryland 2004 (Special Session).
[4] In addition to the Rate Stabilization Account that is described in the text, the Fund is also comprised of a Medical Assistance Program Account, from which disbursements related to the Medicaid program are to be made, and an "unallocated balance." See Letter of Assistant Attorney General Robert N. McDonald to Commissioner Alfred W. Redmer, Jr. (May 10, 2005).
[5] During Fiscal Year 2006, $52 million is allocated to the RS Account to fund subsidies premium subsidies for calendar year 2005. During Fiscal Year 2007, $45 million is allocated to the RS Account to pay subsidies for calendar year 2006. During Fiscal Year 2008, $35 million is allocated to the RS Account for subsidies in calendar year 2007. Finally, during Fiscal Year 2009, $25 million is allocated to the RS Account for subsidies in calendar year 2008.
[6] After June 30, 2009 — i.e., the end of Fiscal Year 2009 — the RS Account essentially disappears and all the money in the Fund will be directed to other purposes specified by the statute. See IN § 19-803(b)(3)(vi).
[7] We use the term "policyholders" throughout the remainder of this opinion to refer to the physicians and nurse midwives who are the beneficiaries of the subsidy under the statute.
[8] A policyholder who opts out would, of course, be required to pay the full amount of the premium billed by the insurer. IN § 19-805(d).
[9] Under certain circumstances, the amounts to be disbursed to the Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual"), the largest malpractice insurer in the State, and to mutual insurance companies generally are limited. IN § 19-805(h) (payments to mutual insurers to be reduced by the amount of any dividend; Medical Mutual not to receive disbursement if Commissioner determines that its surplus is "excessive").
[10] The subsidy may be reduced from the amount determined by the formula if the balance in the RS Account is insufficient to pay the subsidies. IN § 19-804(d). Also, the statute contains a proviso that the computation of the subsidy is not to include the portion of a rate increase resulting from a premium surcharge or the loss of a discount due to a health care provider's loss experience. IN § 19-805(c).
[11] The Commissioner is also to report by December 1 to the Legislative Policy Committee the subsidy factor for the following year, the money available to each insurer, and the number of health care providers eligible for the subsidy. IN § 19-806(b)(2). The Commissioner must also make annual reports to the Legislative Policy Committee in March of each year providing information about the prior year's subsidies. IN § 19-808(c).
[12] This generalization is, of course, subject to various qualifications related to the individual circumstances of the policyholder and the insurer. For example, the policyholder would not be protected from an increase in the premium due to loss experience, and the subsidy would be reduced by the amount of any dividend issued if the insurer were a mutual insurance company.
[13] One can imagine other variations on this scenario with equally odd results. For example, if one insurer with a large market share held premium rates steady in 2006 after a substantial increase in 2005, while an insurer with a small market share obtained just a small increase, the policyholders of the former insurer would receive no subsidy for 2006 while those of the latter might receive a very substantial subsidy. It is difficult to imagine any rational basis for that result.
[14] For example, the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub.L. No. 107-16, 115 Stat. 38, provides for the phase out and repeal of the federal estate tax by 2010 and its resurrection at prior rates in 2011.
[15] Proposed IN § 19-801(d)(1) described the "increased rate factor" for 2005 as "105% of the approved rate in effect 1 year prior to the effective date of the policy." That language literally describes the product of a percentage figure (105%) multiplied by a dollar figure (the prior year's premium). The result of that computation would be a dollar figure rather than the percentage that was undoubtedly intended.
For example, if the approved premium for 2004 had been $200, the "increased rate factor" under this language would be 105% of $200, or $210. The next step would be to compute the "stabilized rate" for 2005, which was defined as the approved rate for the prior year ($200) multiplied by the "increased rate factor" ($210), or, in this case, $42,000. Thus, literal application of the formula in the proposed bill would have led to absurd results that were clearly foreign to the purpose of the bill.
The definition of "increased rate factor" for the subsequent years of the subsidy suffered from the same technical defect. Proposed IN § 19-801(d)(2).
[16] The MIA submission stated, with respect to the subsidy formula in the original bill:
 This formula does not accurately describe the subsidy. The subsidy is not intended to be a reduction of premium owed at the approved rate; it is intended to be a portion of any approved increase in the prior year's premium. Thus, the language should be amended to identify the subsidy as the premium charged by the carrier on the policy at what is currently called the "stabilized rate," minus the rate in effect one year prior to the effective date of the policy.
MIA's Points of Clarification Regarding the Rate Stabilization Fund as Modified in SB 836/HB 1359 at p. 2. The references to "premium" in this paragraph are somewhat unclear as the formula in the original bill contained references to different types of rates while the MIA earlier in its written submission seemed to suggest a more limited use of the term. Depending on how those terms are employed, the second and third sentences of this paragraph appear to describe different calculations.
[17] This assumption was apparently based on historical experience. For example, we understand that the State's largest malpractice insurer had obtained a new approval of its rate plan each year for the past decade. Illustrative examples of subsidy computations provided by MIA to the General Assembly assumed that malpractice insurers would seek and obtain approval of rate increases of 20% in 2006.
[18] Industry representatives who reviewed the floor amendment and advised the floor manager of their assent apparently also failed to grasp the literal significance of the inclusion of the term "initial"in the new formula. See Letter of David M. Funk, Esquire, to David L. Murray, President, Medical Mutual Liability Insurance Society of Maryland (August 12, 2005) at p. 13 n. 1.
[19] For example, the General Assembly may wish to consider whether any allowance should be made in the formula for circumstances in which an insurer lowers rates during the four-year period of the subsidy. *Page 133